Dawe's Laboratories, N. V., Plaintiff-Appellee, *v.* Commercial Insurance Company of Newark, New Jersey, Defendant-Appellant.

(No. 58635; ▮▮▮▮▮▮)

First District (1st Division)—May 20, 1974.

Pretzel, Stouffer, Nolan & Rooney, of Chicago (Joseph B. Lederleitner, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (John M. Moelmann, D. Kendall Griffith, and Rudolph G. Schade, of counsel), for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

This appeal brings before us for review a summary judgment entered in favor of Dawe's Laboratories, N. V., a Belgian corporation (plaintiff) against Commercial Insurance Company of Newark, New Jersey, a corporation, (defendant). Defendant has appealed from this judgment. A general preliminary description of the proceedings is helpful.

Plaintiff obtained a general liability policy of insurance from defendant which included products liability. Plaintiff produces premixes of vitamins and various nutrients which are incorporated into poultry and livestock feed. The case involves one of plaintiff's plants operating in Belgium. A quantity of a certain premix was sold by plaintiff from its Belgian plant to a customer (Morgenstond) in the same country engaged in selling poultry feed. Negotiation commenced between plaintiff and Morgenstond regarding alleged deleterious effects upon poultry from premix sold by plaintiff. Defendant was given notice of the claim but denied coverage.

On April 27, 1970, a written agreement was entered into between plaintiff and defendant. The agreement recited that plaintiff had made a claim under the policy which had caused a dispute between the parties. They agreed that defendant would investigate, compromise and settle the claim and defend any action that might be brought by Morgenstond against plaintiff. Plaintiff agreed to be bound by any settlement effected by defendant and immediately to pay two-thirds "of any settlement and all expenses and costs." Defendant agreed to pay the remaining one-third upon the payment being made by plaintiff. The parties agreed to co-operate each with the other, all without prejudice to or waiver of any of their respective rights.

In due course, a settlement of $89,000 was negotiated. Each of the parties paid his agreed share. Plaintiff then filed the within action for declaratory judgment seeking a declaration that the policy covered the liability (Ill. Rev. Stat. 1973, ch. 110, par. 57.1); judgment that defendant reimburse plaintiff for that portion of the settlement and expenses paid by plaintiff and allowance of statutory attorney's fees (Ill. Rev. Stat. 1971, ch. 73, par. 767.) Plaintiff's motion for summary judgment (Ill. Rev. Stat. 1971, ch. 110, par. 57) was supported by the affidavits of Norbert Wuytack, a clerk in the employ of plaintiff and Jean (or John) Dreiss, former director of technical services for plaintiff and now its European director of marketing.

Defendant filed a response to plaintiff's motion for summary judgment. It set forth that its answer had alleged that it lacked knowledge of certain facts, which indicated that the facts were not undisputed; credibility of witnesses was involved and possible defenses were peculiarly within the knowledge of the plaintiff; the affidavits contained matter inadmissible in evidence; even if the facts were undisputed, it could not be inferred that the issue was one of law; affiants were subject to change of mind or impeachment, particularly where the facts were peculiarly within the knowledge of their employer; and the right to summary judgment was not free from doubt.

Defendant also moved to strike both of the affidavits on the grounds that they contained hearsay; were based upon unauthenticated documents and were replete with conclusions and self-serving statements. Plaintiff filed a response to this motion to strike which set forth that the affidavits were properly authenticated; accompanying exhibits need not be separately authenticated; affiants would be competent to testify to the material set forth; and inadmissibility of certain statements would not invalidate the entire affidavits. Plaintiff also set forth that issues of fact raised by the defendant's answer would not prevent summary judgment where the affidavits disclosed that there is no issue of fact.

Defendant filed counter-affidavits by Dr. Roland W. Winterfield and B. F. Biggs, Jr. Dr. Winterfield is a scientist with extensive qualifications and experience in agriculture and in the veterinary field. Mr. Biggs is an official of a large insurance company with 30 years of experience in the insurance industry. Defendant also took discovery and evidence depositions of a number of witnesses and filed excerpts from their testimony, authenticated by affidavits of counsel. These witnesses included among others Jean (or John) Dreiss and Norbert Wuytack, employees of plaintiff who made affidavits in support of the motion for summary judgment.

Plaintiff made a motion to strike the affidavits of Dr. Roland Winterfield and B. F. Biggs, Jr. As regards the former, the motion set forth that the affidavit was irrelevant and immaterial, contained conclusions rather than facts and raised no issue of fact. The motion averred that the latter was based upon hypothetical facts not before the court and was patently improper because it was directed to the ultimate issue in the case, the legal question of coverage under the policy.

Defendant filed a response to the motion to strike comprising some six pages and containing argument on the merits of the motion, including citation of legal authorities. After full hearing, the trial court granted the motion for summary judgment. Defendant was directed to afford coverage of the claim under the policy and to pay plaintiff the portion of the settlement it had paid to Morgenstond with interest. Defendant was

also ordered to reimburse plaintiff for expenses incurred by plaintiff in handling the claim and negotiation of the settlement and to reimburse plaintiff for expenses incurred in the preparation and prosecution of the within action with these amounts to be reserved for further determination by the court. The order also sustained the motion of plaintiff to strike the affidavits of Winterfield and Biggs and the motion of defendant to strike the affidavits of plaintiff was denied.

In this court, defendant urges that the court erred in striking the counter-affidavits of Winterfield and Biggs and in entering summary judgment because there were conflicts and issues of fact and questions of credibility of witnesses which required trial. In response, plaintiff urges that whether a liability insurance policy provides coverage is determined by the claim of the injured party; summary judgment is proper when there is no genuine issue concerning any material fact; the policy of insurance does not exclude production mistakes, mistakes in formulas not prepared by plaintiff and active malfunctions of a product; the Morgenstond claim arose out of a production error during filling of a formula prepared by Morgenstond; defendant cannot deny coverage on the theory that the Morgenstond claim is groundless; and the trial court properly struck the Winterfield and Biggs affidavits.

The insurance policy issued by defendant contains a number of exclusions to which the coverage "does not apply." Since the difference of opinion between these parties is concerned with one of these exclusions, we will state it in full:

"This insurance does not apply: * * *

( e ) to bodily injury or property damage resulting from the failure of the named insured's products or work completed by or for the named insured to perform the function or serve the purpose intended by the name insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work; * * *."

The plaintiff's motion for summary judgment set forth that a claim was made against plaintiff by its customer Morgenstond because of the failure of plaintiff to add sufficient vitamin D3 in the filling of two orders for approximately 12 tons of nutrient and vitamin additives purchased by Morgenstond in July of 1969. It averred that a mistake was made by Norbert Wuytack, its employee, in filling an order given pursuant to certain formulas "which had previously been formulated." It set out that the only defense alleged by defendant is that contained in exclusion ( e )

of the policy. Defendant contends that there was a mistake or deficiency in a formula whereas plaintiff contends that the claim resulted not from a mistake or deficiency in a formula but from a mistake by plaintiff's clerk in filling an order according to a formula previously developed without error.

Before summarizing the affidavits in support of the motion for summary judgment, we should state certain important definitions. As used in this litigation, the word "premix" is a technical term which refers to an assembly or combination of vitamins, minerals and additives. "Additives" is also a technical term which, as used here, includes antibiotics, antioxidents and coccidiostats. The term "coccidia" is used in scientific circles to describe small scaly insects. Their presence in the digestive tracts of chickens causes abnormal symptoms, referred to as coccidiosis, and sometimes death. The terms "coyden" and "amprolium" describe chemicals generally used as additives to the premix to prevent this condition. They are sometimes described as "coccidiostats." These substances were frequently substituted for each other as constant, unvarying use would cause either one to lose its effectiveness. The various substances or additives, together with vitamins and nutrients, thus composed the premix. The premix in turn was combined with fodder of various types to form the finished chicken feed.

The affidavit of Norbert Wuytack set forth that he was a clerk in plaintiff's production department. Morgenstond had prepared its own formula for a premix for broiler feed and had submitted these specifications to plaintiff. Engineers from plaintiff's technical services department had reduced the formula to writing and it had been registered with the Belgian Ministry of Agriculture. Plaintiff had maintained a master formula sheet reflecting these specifications. Morgenstond requested changes in this formula from time to time.

The affidavit further stated that, on April 2, 1968, one of the formulations thus requested by Morgenstond was registered by plaintiff with the Ministry of Agriculture of Belgium under Code No. 5051. Wuytack then prepared a so-called standard dump sheet which would translate the master formula for the premix into weights and measures of products to be mixed by the production department. A sample of the master formula appended to the affidavits shows quantities of the ingredients for the premix in grams, milligrams and number of units of vitamins sufficient to comprise one kilogram. It also reflects the amount of amprolium necessary to make this 1 kilogram of the premix. All of the ingredients are identified by code numbers. The affidavit set forth that the affiant prepared the standard dump sheet for this formula on February

10, 1969. The accuracy of this document was verified by the technical services department of plaintiff.

Shortly thereafter Morgenstond decided that it would change the coccidiostat in the formula and would use coyden instead of amprolium. Accordingly, a new master formula sheet was prepared reflecting this change and was registered in Belgium under Code No. 5009. The affiant prepared another standard dump sheet for this new formula which was also verified by plaintiff's technical staff. As orders were received, new dump sheets or production sheets were prepared which reflected the amounts of the various ingredients to be used in filling the formula for the quantity of premix contained in orders placed by Morgenstond. These sheets are referred to as production sheets to avoid confusion. These production sheets were used by a manufacturing crew who dumped the specified ingredients into a mixer. The completed additive would then be packaged and shipped to the customer. These various production sheets were prepared by Norbert Wuytack, but, since they involved simply a matter of arithmetical calculation of quantities to make the amount of premix required by the specific order, the production sheets were never submitted to the technical staff.

The affiant also stated that in June of 1969, plaintiff received an order for 12 tons of the premix. The affiant prepared a production sheet reflecting the quantities of each substance to fill this order. He found that the standard dump sheet required a substance referred to as vitamin AD3 which was a combination of vitamins A and D3. This particular substance was not in stock. Accordingly, the witness substituted vitamin A (No. 7000 under plaintiff's code) for vitamin AD3 (Code No. 7010). The affiant stated that he forgot that by so doing the amount of vitamin D3 (referred to as Code No. 7020) had been decreased. Affiant did not submit this new production sheet to the technical staff since, as above shown, its preparation was entirely a matter of simple calculation. Accordingly, the 12 tons of additive when fabricated and sent to Morgenstond did not comply with the master formula because they contained an insufficient quantity of vitamin D3.

The remaining affidavit in support of plaintiff's motion was made by Jean (or John) Dreiss. It showed that plaintiff produced premixes of vitamins and nutrients for fortification of feed for poultry and livestock. A customer would fix the formula desired and would specify the quantities of units and grams of each vitamin and nutrient required in the formula. Plaintiff would then prepare a master formula which would be registered with the Belgian Ministry of Agriculture. This master formula might be modified from time to time by the customer. Plaintiff also

would prepare a standard dump sheet reflecting this formula for use in filling orders. In addition, a clerk would prepare a dump sheet, or production sheet, for each production of subsequent orders. This would be prepared from the standard dump sheet as a guide. The clerk might substitute ingredients such as vitamins, always making sure that the amount of the vitamin would be that required by the master formula.

Commencing in 1968, Morgenstond specified a formula for broiler feed to plaintiff. The engineers of plaintiff's technical services department placed this formula in technical form and had it registered with the Belgian Ministry. A standard dump sheet was prepared by Wuytack and verified by plaintiff's engineers. This preparation was a clerical function which would translate the master formula into weights and measures for the use of the production department.

In February of 1969, Morgenstond modified this formula by changing the coccidiostat to coyden. A new master formula was registered and another standard dump sheet was prepared and verified by the engineers. In June of 1969, plaintiff received an order for 12 tons of this premix from Morgenstond. The clerk who prepared the production sheets was Norbert Wuytack. His task was to make substitutions in nutrients and vitamins, if necessary, because of depletion of stock, without varying the relative quantities thereof as required by the master formula. Furthermore, in preparation of the production sheet, the standard dump sheet, reflecting the 1000 kilogram quantity, had to be arithmetically converted into the 12 ton quantity specified in the order. These were clerical tasks, completely unrelated to the basic formula of the premix, and which, therefore, were not checked by managerial personnel or by any engineer.

In August of 1969, Morgenstond complained that broilers to which the premix was fed had developed rickets. They thought this was due to lack of vitamin D3. Dreiss investigated and found that a clerical mistake had been made, as set forth in the affidavit of Wuytack, which reduced the amount of vitamin D3 required by the master formula. He examined the master formulas and standard dump sheets and found them to be correct. The mistake had been made in preparation of the production sheet. Affiant stated that Wuytack had nothing to do with preparation of a formula plan or specifications. This was done by Morgenstond and the formulas were reduced to writing by plaintiff's engineers, for filing with the Ministry of Agriculture. There was no error in preparing the formula plan or specifications; the mistake was made in filling the customer's order.

The counter-affidavits filed by defendant fall into two groups. The first, which we will now consider, consisted of verified excerpts from de-

positions of various witnesses taken by counsel for defendant. The second category, which will be considered later, consisted of the affidavits of Winterfield and Biggs.

The deposition of Joseph Arnold Vanvaerenberg shows that he was a nutritionist and chemical engineer in charge of the laboratory of Morgenstond. He composed formulas for animal food. His deposition set forth the purpose of coyden and amprolium as above elucidated. He pointed out that his company used several suppliers for chicken feed as distinguished from premixes or vitamin concentrates. These latter materials, which contain vitamins, minerals, antibiotics and coccidiostats to suppress coccidia, came only from plaintiff. A differentiation must be made between the formulatons of chicken feed and premixes. All of the additives mixed together and constituting the premix form only 1% of the quantity of the chicken feed or fodder. These items are intermingled and fed to the chickens together. Plaintiff sells, and sold to Morgenstond, only the premix and none of the remaining ingredients.

Excerpts from the deposition of Jean (or John) Dreiss serve to verify the matters contained in his affidavit. This witness referred to an additive as one single ingredient, while a premix was defined as an assembly of various additives and vitamins. In its business, plaintiff sold only premixes to Morgenstond and its other customers. Plaintiff would sometimes formulate chicken feed or fodder and furnish this information to the customer to assist the latter in obtaining the necessary calories and efficiency at the lowest cost. However, the ingredients in premixes were always specified to plaintiff by Morgenstond. No other part of the chicken feed was sold by plaintiff. In the particular case here involved, the same procedure was followed and premix specifications expressed in terms of units per kilogram of premix were prepared by Morgenstond and sent to plaintiff. The master formula was written out by plaintiff and registered with the Belgian authorities. A clerk would prepare a standard dump sheet as above described. In addition, whenever an order was received the clerk would prepare a production dump sheet to be used by the workers in the plant in preparing the premix. When the customers modified the master formula, such as by a modification of the coccidiostat, a new registration with the Belgian authorities was required. The production dump sheet prepared by the clerk was not checked by the technical staff, although the standard dump sheet always was.

The excerpts from the deposition of Norbert Wuytack also corroborated in effect the material contained in his affidavit. He also stated that he had never attended college; had no courses in chemistry or vitaminology and had no education or training in calculating formulas or in preparing any kind of formula. The production dump sheets pre-

pared by him were not approved or checked by any other person employed by plaintiff. It should also be noted that the discovery deposition of Theo. Dubois, employed by plaintiff's technical services department, described the formulas bearing Code Nos. 5009 and 5051 (using coyden and amprolium respectively) as "D. C. M. items." These initials stand for Dawes Custom Mix which in turn refers to a product in which "the formula is imposed by the customer." The witness also testified that these formulas were made up by Morgenstond and then submitted to plaintiff so that plaintiff had "nothing to do with" the "formulating" or "checking out" of these formulas.

■■ The basic principles of summary judgment procedure have been so frequently described that they need no further elucidation here. It suffices to note that summary judgment is proper where there is no genuine issue as to any material fact; we must strictly construe affidavits in support of the motion and counter-affidavits should receive liberal construction. (See *Fooden v. Board of Governors,* 48 Ill.2d 580, 587, 272 N.E.2d 497, and cases there cited.) See also *Watson v. Southwest Messenger Press,* 12 Ill.App.3d 968, 972,. 299 N.E.2d 409, and cases there cited.

■■ In considering the language of the policy of insurance, as above quoted, our primary objective must be to ascertain and to give effect to the intention of the parties as therein expressed. Where there is no ambiguity in the policy provision, the intent of the parties "must be determined solely from the language used." (*Schek v. Chicago Transit Authority,* 42 Ill.2d 362, 364, 247 N.E.2d 886.) In this regard, insurance policies must be treated like any other contract and "[w]here the language in a policy is clear and unambiguous, it must be taken in its plain, ordinary and popular sense." (*Hartford Accident & Indemnity Co. v. Case Foundation Co.,* 10 Ill.App.3d 115, 121, 294 N.E.2d 7.) "The issue of whether an ambiguity exists in a contract is a question of law." *Gaffney v. Burns Detective Agency,* 12 Ill.App.3d 476, 480, 299 N.E.2d 540 and cases there cited.

Applying these principles to the language of the policy exclusion before us, we conclude, as a matter of law, that the language in this exclusion is clear and unambiguous. In the context of the facts shown here, it may be read and understood by giving all of the language its plain and ordinary meaning. Situations in which bodily injury or property damage result from a mistake or deficiency in any formula prepared by plaintiff are excluded from coverage (subject only to the exception in the final language of the above policy excerpts pertaining to "active malfunctioning" which we need not consider).

According to the clear and unmistakable language of exclusion (e), two concurrent factors must be present to prevent coverage: the formula

must have been prepared or developed by the plaintiff and the failure must have been due to a mistake or deficiency in the formula itself. The language of the exclusion points up and emphasizes the basic difference between formulation and production of the premix. Only the former is eliminated from coverage by the exclusion.

■■ The affidavits in support of plaintiff's motion for summary judgment show that the formula for the premix assembled and sold by plaintiff was prepared and developed not by plaintiff but by Morgenstond, the customer. Plaintiff's activity in connection with the formula itself consisted solely in writing out, or formalizing, the master formula as requested by the customer and sending it to the Belgian government for registration. The formula was not prepared or developed by plaintiff. In addition, no mistake was made in connection with the formula as such. The affidavits presented by plaintiff show clearly that a mistake was made by clerical help in producing the premix. These facts are not contradicted or disputed in any manner by the counter-affidavits submitted by defendant. After consideration and review of the affidavits presented by both sides, it follows that plaintiff has established that there is no dispute in any material issue of fact between these parties. Morgenstond's claim against plaintiff was clearly within policy coverage.

■■ We should also point out here that even if the language in the exclusion above analyzed was "susceptible of two constructions, that construction will be adopted which is more favorable to the insured." (*Home & Automobile Insurance Co. v. Scharli*, 10 Ill.App.3d 133, 136, 293 N.E.2d 914.) This principle is most rigorously applied in considering the meaning of exclusions incorporated into a policy of insurance. Expressions used by an insurer in attempting "to limit its liability will be construed most strongly against the insurer and liberally in favor of the insured." (*Bell v. Continental Assurance Co.*, 123 Ill.App.2d 274, 278, 260 N.E.2d 114.) An interpretation of the above exclusion to eliminate the liability of the insurer in the case at bar and to exclude production and manufacturing mistakes would virtually emasculate insurance protection against product liability. On the basis of all of the material above considered, plaintiff's right to summary judgment seems clear and certain.

It remains now to consider the two counter-affidavits stricken by the trial court. The affidavit of Dr. Roland W. Winterfield, a highly qualified expert, expressed the opinion, based upon a reasonable degree of scientific certainty, that an absence or deficiency of vitamin D3 in the diet of chickens would not cause rickets but would at best fail to prevent the disease where the calcium or phosphorous levels of nutrition were adequate or in proper balance. We need not consider the correctness of

this scientific opinion. An affidavit or information of this type might have had materiality in a situation in which defendant as the insurer would be defending plaintiff against a suit brought by Morgenstond. The opinion of the expert goes to the merits of the claim of Morgenstond against plaintiff. It has no materiality to the issue of policy coverage which is before us. The policy of insurance here provided that it was defendant's duty to extend coverage and "to defend any suit against the insured seeking damages * * * even if any of the allegations of the suit are groundless, false or fraudulent * * *." Defendant would thus be obliged to defend plaintiff if suit had been filed by Morgenstond which would have "brought the case within or potentially within the coverage of its insurance contract." (*Hartford Accident & Indemnity Co. v. Case Foundation Co.*, 10 Ill.App.3d 115, 121, 122, 294 N.E.2d 7.) These portions of the Winterfield affidavit thus do not raise any material issue of fact.

In his affidavit, this expert also answered a lengthy hypothetical question based generally upon the facts appearing from the affidavits in support of plaintiff's motion for summary judgment. He expressed an opinion "based upon a reasonable degree of scientific certainty" that the result of the substitution of vitamin A for vitamin AD3 by the clerk in preparing the production sheet was actually a substitution of one substance for another and did not constitute a substitution of chemical or biological equivalents so that "the end result or product is a new formulation or reformulation which so violates the original formula as to supersede it." In other words, the expert took the position that the clerk who prepared the production sheet by his error created a completely new formula for preparation of the premix.

■■ Under the circumstances disclosed in the case at bar, the application of the policy exclusion to the undisputed facts before us is a question of law. It is the duty of the court and of no one else to determine whether the error made by the clerk is a mistake in formulation under the provisions of the policy exclusion or whether it is a mistake in production or manufacture. The meaning of the language used in the policy exclusion, in the frame of reference to the undisputed facts established in this record, is a matter of law for decision by the court. (*Cohen v. Northwestern National Life Insurance Co.*, 124 Ill.App.2d 15, 18, 259 N.E.2d 865). Expert opinion on a problem of this type is inadmissible and patently unacceptable. See *National Fire Insurance Co. v. Hanberg*, 215 Ill. 378, 382, 74 N.E. 377.

■■ The same criticism is properly leveled against the affidavit of B. F. Biggs, Jr. This document is simply an attempt to interpret the policy exclusion which is a matter solely within the province of courts and judges. In addition, as plaintiff properly urges, the opinion expressed

in his affidavit is predicated upon the assumption that plaintiff prepared the premix formula. As shown, this assumption is directly contrary to the uncontradicted affidavits before us. The Biggs affidavit also states the same opinion as the Winterfield affidavit regarding creation of a new formulation by the mistake of plaintiff's clerk. This affiant was by no means qualified as an expert to express such an opinion even if it would be legally permissible. (*Gibson v. Healey Brothers & Co.,* 109 Ill. App.2d 342, 352, 353, 248 N.E.2d 771.) We conclude that the trial court was correct in striking both the Winterfield and Biggs affidavits.

Since we have concluded that the claim made against plaintiff was not excluded from coverage under exclusion (e) above set forth, we need not consider the applicability of the expressed exception thereto regarding "active malfunctioning" of the product.

Full consideration and careful thought concerning all of the affidavits and counter-affidavits as well as the entire record before us lead to the conclusion that the judgment order appealed from is proper in all respects and that it should be affirmed.

Judgment affirmed.

EGAN, P. J., and HALLETT, J., concur.