PATRICIA PIETRZAK, Indiv. and as Daughter and Next Friend of Steven Pietrzak, *et al.*, Plaintiffs-Appellants, v. RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER *et al.*, Defendants-Appellees.

First District (5th Division)    No. 1—95—1575

Opinion filed October 4, 1996.—Rehearing denied November 1, 1996.

Keith L. Davidson & Associates, of Chicago (Keith L. Davidson and Richard A. Michael, of counsel), for appellants.

Lord, Bissell & Brook (David J. Slawkowski, Hugh C. Griffin, Diane I. Jennings, and Laura J. Ginett, of counsel), and Swanson, Martin & Bell, both of Chicago (Leonard C. Swanson and Aaron T. Shepley, of counsel), for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiffs, Patricia and Caroline Pietrzak, filed a medical malpractice claim against defendants, Rush-Presbyterian-St. Luke's Medical Center (Rush), University Anesthesiologists, S.C. (UASC), and Dr. Dickson Wu, claiming that defendants negligently treated Steven Pietrzak. A jury held for defendants as to all counts. Plaintiffs appeal, seeking either a new trial or an evidentiary hearing to examine their claim that Rush's counsel committed prejudicial fraud on the court.

We affirm.

On April 1, 1992, Steven Pietrzak suffered a cardiac arrest during prostate surgery at Rush. The cardiac arrest caused severe brain

damage. Dr. Wu and UASC were the attending anesthesiologists, and Dr. Wu intermittently supervised resident Dr. Michael Fox's administration of anesthetic for the surgery.

On September 16, 1992, plaintiffs filed their complaint against defendants, alleging that they negligently caused Mr. Pietrzak's cardiac arrest. Patricia Pietrzak acted individually and as daughter and next friend of Mr. Pietrzak, and Caroline Pietrzak sought damages for loss of consortium. The complaint alleged that defendants were responsible for deficient potassium levels (hypokalemia) and blood volume levels (hypovolemia) in Mr. Pietrzak, and that either or both of these deficiencies caused his cardiac arrest.

On January 6, 1994, a jury trial commenced on the complaint. Plaintiffs presented expert testimony that hypokalemia and/or hypovolemia caused the cardiac arrest. Defendants presented expert testimony that the arrest was caused by a sudden and unpreventable event, either an air embolism or an adverse reaction to the dye used in prostate surgery. On February 18, 1994, the jury returned a verdict in favor of defendants.

On March 11, 1994, plaintiffs filed a post-trial motion requesting a new trial, and they filed an amended motion on August 15, 1994. The amended motion alleged two improprieties discovered only after the trial's completion. First, plaintiffs claimed that they were prejudiced when two jurors consulted the dictionary for definitions of "timely," a word that appeared several times in the jury instructions referring to whether defendants rendered medical care in a timely fashion. One juror did not share her dictionary definition of "timely"—"occurring at a suitable or opportune time; well-timed"—with other members of the jury. The other juror did not find the definition of "timely," but informed the jury of the following definitions: "time—measure of duration" and "duration—a limit of time." Plaintiffs moved to introduce testimony by linguistic expert Dr. Sadock on the possible prejudice that the definitions may have caused. Dr. Sadock's affidavit stated:

> "[T]he post-trial motion raises an issue whether the jury's verdict was probably prejudiced by the introduction of extraneous dictionary definitions. *** I have indicated that, because it was a legal issue, it transcends the expertise of a linguist. *** [L]egal expertise is needed to understand ['probably' and 'prejudice'] and apply the legal test."

The court denied plaintiffs' motion to allow Dr. Sadock's testimony. On May 5, 1995, the court issued a written opinion holding that the dictionary definitions at issue were ordinary, neutral, and nonargumentative definitions that did not improperly influence the jury, and, thus, the court denied the motion for a new trial.

The second alleged impropriety that plaintiffs discovered post-trial was an alleged fraud on the court by Rush's counsel regarding a videotape demonstration shown at trial. The two-minute videotape was shown to the jury to inform it of the sights and sounds that a medical device—a pulse oximeter—would convey to Dr. Fox during surgery. Prior to the demonstration, the following colloquy ensued:

"MR. DAVIDSON (plaintiffs' counsel): Now, Mr. Achilles [Rush's clinical engineer], who produced the lists of the equipment said he could not say which [oximeter] it was. It was one of two, and he didn't know which.

MR. SLAWKOWSKI (Rush's counsel): One of two types. Dr. Fox will testify that this was the type of oximeter that was being used.

MR. DAVIDSON: The same model, same year, that sort of thing.

MR. SLAWKOWSKI: Same type.

MR. DAVIDSON: Well, I think it's required to show that if it was one of two, that he knows which it was, that it was the same year, it's not some subsequent year. That's why the foundation to be made, he will be obligated to lay.

MR. SLAWKOWSKI: We'll lay it.

\* \* \*

MR. DAVIDSON: I would simply ask that the witness lay the foundation rather than counsel, and that he establish these points that it's the same machine and so on.

THE COURT: I'm curious to know what your expert has to say, but my view, based on all that I know about the case, is that it doesn't look like a reconstruction. It looks simply like giving us an opportunity to see how they look and sound, and so we'll see what Dr. Fox has to say."

The videotape demonstration contained an Ohmeda 5250 monitor, and plaintiffs claimed that this monitor differed materially from the monitors that Mr. Achilles had testified might have been present, an Ohmeda 3700 or a Nellcor N-100. The Ohmeda 3700 and Nellcor N-100 do not display continuous readouts of oxygen and carbon dioxide, while the Ohmeda 5250 has this capability. The videotape demonstration did not use these continuous readout functions of the Ohmeda 5250, but Dr. Fox testified that he had access to continuous readouts of oxygen and carbon dioxide during the procedure, testimony that plaintiffs claimed was crucial. Plaintiffs' position is summarized as follows: (1) Rush's counsel made a false representation of fact with his "same type" description of the videotape monitor; (2) this fraudulent representation prevented plaintiffs from realizing that the machine in the video was not the "same type" as in surgery; (3) this misled plaintiffs into not challenging that the machine used was an Ohmeda 5250; and (4) because plaintiffs were

misled, they lost the opportunity to impeach Dr. Fox's testimony on continuous readouts with his own prior inconsistent statements or the testimony of Mr. Achilles. Defendants responded that there was no misrepresentation, because the videotape demonstrated only the features identical on all models, and that there was no prejudice suffered by defendants.

The court denied plaintiffs' motion, holding that: (1) the record established a strong likelihood that the Ohmeda 5250 was actually used in the surgery; (2) any "misrepresentation" was innocent, not fraudulent, because no one was fully apprised of all the relevant facts; (3) plaintiffs did not reasonably rely on any misrepresentation because they had full knowledge of Dr. Fox's inconsistent deposition testimony and other impeaching evidence; and (4) any error was not so prejudicial as to require a new trial. The court did not answer whether counsel's "same type" answer was a misrepresentation under the alleged circumstances involving a demonstration of identical functions with a different model. The court also denied a new trial based on several alleged trial errors. Plaintiffs appeal the denial of their motion for a new trial, alleging that they were denied a fair trial through fraud by Rush's counsel, extraneous dictionary definitions, improper conduct by defense counsel, and the failure to give Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1989) (hereinafter IPI Civil 3d) regarding the destruction of evidence within a party's control.

ANALYSIS

I

Plaintiffs first contend that fraud by Rush's counsel entitles them to a new trial. A trial court's ruling that no prejudicial error occurred is entitled to great weight on appeal, and we will reverse the court's ruling only if the court abused this discretion. *Drews v. Gobel Freight Lines, Inc.*, 197 Ill. App. 3d 1049, 1061, 557 N.E.2d 303 (1990).

■ Initially, we conclude that no misrepresentation by counsel ever occurred. Plaintiffs' brief alleges, "Rush's counsel represented that the videotape demonstrated '*the same type*' as Rush's clinical engineer [Mr. Achilles] had testified was used in Pietrzak's surgery." (Emphasis added.) We review the relevant colloquy:

"MR. DAVIDSON: Now, Mr. Achilles, who produced the lists of the equipment said he could not say which it was. It was one of two, and he didn't know which.

MR. SLAWKOWSKI: One of two types. *Dr. Fox will testify that this was the type of oximeter that was being used.*

MR. DAVIDSON: The same model, same year, that sort of thing.

MR. SLAWKOWSKI: Same type." (Emphasis added.) Davidson's question on models and Slawkowski's answer of "same type" both referred to Slawkowski's statement that "Dr. Fox will testify that this was the *type* of oximeter that was being used." (Emphasis added.) Plaintiffs have never disputed that Dr. Fox testified that an Ohmeda 5250 was the type of oximeter that was being used and that it was the same model as shown in the videotape. Indeed, plaintiffs expressly complain about Dr. Fox's testimony regarding continuous readouts, which could only have resulted from an Ohmeda 5250. Although plaintiffs claim that Rush's counsel made a representation regarding the videotape and Mr. Achilles' testimony, the record shows that counsel only reiterated Mr. Achilles' testimony and made no representation whatsoever regarding this testimony. It is true that Rush's counsel did not volunteer that Mr. Achilles' testimony could impeach Dr. Fox's coming foundation testimony, but counsel was not required to advocate for both sides. There was nothing false about the only representation that Mr. Slawkowski made, and, thus, no fraud occurred in this matter. Because of our finding that no misrepresentation ever occurred, we need not examine plaintiffs' contention that the court was required to conduct additional evidentiary hearings into their allegations of fraud.

Even assuming *arguendo* that counsel had made a misrepresentation, we agree with all four of the court's reasons for determining that such a misrepresentation would not require a new trial. The trial court was in a far superior position to determine whether a prejudicial fraud had been perpetrated on it. See *In re Application of the County Treasurer*, 267 Ill. App. 3d 993, 999, 642 N.E.2d 741 (1994). The record provides support for all four of the court's rationales, and we conclude that none of the court's holdings constitutes an abuse of discretion.

## II

■ Plaintiffs next argue that the jury's consideration of two dictionary definitions for "timely" was reversible error. While evidence that the jury considered extraneous information can be used to impeach the verdict, not every instance in which unauthorized information reaches the jury results in reversible error. *Macias v. Cincinnati Forte*, 277 Ill. App. 3d 947, 661 N.E.2d 472 (1996). The losing party must first prove that the unauthorized information relates directly to an issue in the case and may have improperly influenced the verdict. *Macias*, 277 Ill. App. 3d at 950. "The burden then shifts to the prevailing party to demonstrate that no injury or prejudice resulted." *Macias*, 277 Ill. App. 3d at 950. "Because the actual effect

of the extraneous information on the minds of the jury cannot be proved, the standard to be applied is whether the conduct involved such a probability that prejudice would result that [the trial] is to be deemed inherently lacking in due process." *Macias*, 277 Ill. App. 3d at 950.

■ Before analyzing the circumstances of this matter, we respond to the plaintiff's assertion that "it is presumed that any extraneous matter brought before the jury is misleading, absent rebuttal by the proponent of the verdict." This contention is incorrect; as we stated in *Macias*, "The losing party [must first prove] that the unauthorized information relates directly to an issue in the case *and may have improperly influenced the verdict*." (Emphasis added.) *Macias*, 277 Ill. App. 3d at 950. Although plaintiffs cite four different authorities for their assertion, we will respond directly to their reply brief's citation of *People v. Holmes*, 69 Ill. 2d 507, 372 N.E.2d 656 (1978). *Holmes* stated:

> "Presumably there are many types of *** 'outside influence(s),' and we need not and do not discuss whether and in what types of situations a *defendant* might be required to show 'such a probability that prejudice will result that it is [to be] deemed inherently lacking in due process.' [Citation.] *Here*, the 'extraneous information' improperly brought to the jury's attention was in the nature of evidence with which the defendant had not been confronted at trial and which he had no opportunity to refute." (Emphasis added.) *Holmes*, 69 Ill. 2d at 516-17.

Thus, *Holmes* held that the court could not presume prejudice from all extraneous information, but that prejudice could be presumed when the information was additional unconfronted evidence. Plaintiffs' other citations likewise fail to support their claim.

■ When the jury consults outside sources for definitions of words contained in jury instructions, the court must determine whether the definitions conflict or substantially differ from the instructions. See *Macias*, 277 Ill. App. 3d at 951. Where the outside definitions do not contradict, nullify, or negate the court's jury instructions, the error is harmless. See *Macias*, 277 Ill. App. 3d at 950-51 (dictionary definitions of "reasonable" and "reasonable care" did not substantially differ from jury instructions).

■ We first analyze the effect of the juror who did not share her dictionary definition of "timely"—"occurring at a suitable or opportune time; well-timed"—with other members of the jury. We agree with the trial court that this is a neutral, ordinary, and nonargumentative definition of the word that does not contradict the court's jury instructions. Although plaintiffs contend that the juror's dictionary

defined "opportune" to indicate convenience to the actor, Webster's Ninth New Collegiate Dictionary 828 (1985) defines "opportune" as "suitable or convenient for a particular occurrence" and "occurring at an appropriate time." These definitions are not substantially different from "timely," and we note that plaintiffs have not alleged that the juror involved consulted her dictionary to define "opportune."

We also agree with the court that the error was harmless when another juror informed the jury of the definitions "time—measure of duration" and "duration—a limit of time." Plaintiffs contend that this definition imposed an increased burden to prove that defendants had failed to provide proper medical care within a measurable "limit of time," whereas plaintiffs were only required to prove that medical care was not "timely." However, an examination of timeliness requires a measurable limit of time. Moreover, plaintiffs have added the term "measurable" to the dictionary definition without justifying this additional adjective. Although plaintiffs attempt to cite individual jurors as to how the definitions affected their deliberations, evidence relating to the effect of outside influences on the mental processes of jury members is inadmissible. *Holmes*, 69 Ill. 2d at 514. Plaintiffs have not demonstrated that the extraneous definitions may have improperly influenced the verdict, and, thus, the trial court did not abuse its discretion.

Lastly, we agree with the court's denial of expert linguistic testimony on this issue. Even plaintiffs' expert stated that legal expertise was necessary to understand the term "prejudice" and apply the legal test. This court has repeatedly held that language interpretation is a question of law for the court so that expert linguistic testimony may be disallowed. *Rusk Aviation, Inc. v. Northcott*, 151 Ill. App. 3d 126, 130, 502 N.E.2d 1309 (1986) (expert testimony disallowed concerning statute); *Dawe's Laboratories, N.V. v. Commercial Insurance Co.*, 19 Ill. App. 3d 1039, 1050, 313 N.E.2d 218 (1974) (expert testimony disallowed concerning contract). Whether an outside dictionary definition contradicts a jury instruction is a question of language interpretation, and, thus, the court's ruling was proper.

### III

■ Plaintiffs next contend that several instances of improper conduct by defense counsel require that we grant a new trial. Argument and conduct constitute reversible error only when they are so prejudicial as to deprive the other party of the right to a fair trial. *Balzekas v. Looking Elk*, 254 Ill. App. 3d 529, 535, 627 N.E.2d 84 (1993). The court's decision denying a new trial on this basis will not

be overturned absent a clear abuse of discretion. *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1061, 645 N.E.2d 284 (1994).

In most instances of the alleged misconduct, the court sustained objections by plaintiffs and told the jury to disregard defendants' statements. Under such circumstances there is ordinarily no reason to believe that the jury was prejudiced. *Balzekas*, 254 Ill. App. 3d at 535-36. Nevertheless, plaintiffs are particularly critical of two questions that we will examine. The first involved an inquiry about medical insurance to plaintiffs' expert on future expenses, but this expert introduced an exhibit that stated, "medical insurance may be impossible to obtain." Once defendants alerted the court to this statement, the court revised its ruling and held that the question was not improper, and we agree with the court's decision under these circumstances. See *Bass v. Washington-Kinney Co.*, 119 Ill. App. 3d 713, 729, 457 N.E.2d 85 (1983) (no error where plaintiff first raised insurance issue). Defendants' other question introduced post-occurrence medical opinion as to the proper standard of care, but any possible prejudice was very limited in this case, as even the plaintiffs' brief admits that "it was on the causation issue that the case was hardest fought." As to plaintiffs' other allegations, sustaining plaintiffs' objections on these matters was curative enough so that the court's. refusal to grant a new trial was not a clear abuse of discretion.

The only alleged misconduct on which the court overruled plaintiffs' objections was defendants' closing argument to limit any award to the medical and caretaking expenses for Mr. Pietrzak. However, because the jury never had occasion to consider damages, any possible error would be irrelevant and not prejudicial to plaintiffs. Lastly, plaintiffs complain of comments during closing argument to which they made no objection, but their failure to object has waived any error. *Chiricosta v. Winthrop-Breon*, 263 Ill. App. 3d 132, 152, 635 N.E.2d 1019 (1994).

IV

■ Plaintiffs next claim that because Dr. Fox destroyed his personal "trainee copy" of the anesthesia chart, the court erred in denying plaintiffs' request for IPI Civil 3d No. 5.01 regarding the destruction of presumably favorable evidence within a party's control. The decision whether to give IPI Civil 3d No. 5.01 is within the trial court's sound discretion and is reversible only after a showing of clear abuse. *Cleveringa v. J.I. Case Co.*, 230 Ill. App. 3d 831, 855-56, 595 N.E.2d 1193 (1992).

A party must satisfy four criteria to entitle it to IPI Civil 3d No.

5.01, and one of these requirements is that the requested evidence was in fact within the party's control. *Cleveringa*, 230 Ill. App. 3d at 855. However, Dr. Fox was never a party to this case. Although plaintiffs claim that it is "indisputable" that Rush controlled Dr. Fox's personal copy, they provide no logic or support for this contention. Plaintiffs' reply brief introduces an agency theory of control, but plaintiffs waived this argument by failing to include it in their appellate brief. *Obenland v. Economy Fire & Casualty Co.*, 234 Ill. App. 3d 99, 599 N.E.2d 999 (1992). Plaintiffs have not explained how Rush had any control over Dr. Fox's personal copy of the chart, and, thus, there is no showing of clear abuse by the trial court.

## V

Lastly, plaintiffs claim that the jury's decision was against the manifest weight of the evidence and that the court erred in granting partial summary judgment against Patricia Pietrzak on two counts. However, plaintiffs have not provided any arguments or citations to support these claims. Supreme Court Rule 341(e)(7) (145 Ill. 2d R. 341(e)(7)) provides that the appellant's brief shall contain the contentions of the appellant and the reasons thereof, with citations of authorities, and plaintiffs have waived these contentions for their failure to conform to appellate procedure. *Pyskaty v. Oyama*, 266 Ill. App. 3d 801, 822, 641 N.E.2d 552 (1994). Plaintiffs also admitted at oral argument that they waived these claims, allowing us to conclude this opinion in timely fashion.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

McNULTY, P.J., and HOURIHANE, J., concur.