No. 1-95-1575

PATRICIA PIETRZAK, Indiv. and ) APPEAL FROM THE 
as Daughter and Next Friend ) CIRCUIT COURT OF 
of Steven Pietrzak, and ) COOK COUNTY. 
CAROLINE PIETRZAK, )
 )
 Plaintiffs-Appellants, )
 )
 v. ) No. 92 L 11510
 ) 
RUSH-PRESBYTERIAN-ST. LUKE'S )
MEDICAL CENTER, UNIVERSITY ) 
ANESTHESIOLOGISTS, S.C., and )
DICKSON WU, ) THE HONORABLE
 ) JULIA M. NOWICKI, 
 Defendants-Appellees. ) JUDGE PRESIDING.

 
 JUSTICE COUSINS delivered the opinion of the court: 
 Plaintiffs, Patricia and Caroline Pietrzak, filed a medical
malpractice claim against defendants, Rush-Presbyterian-St.
Luke's Medical Center (Rush), University Anesthesiologists, S.C.
(UASC), and Dr. Dickson Wu, claiming that defendants negligently
treated Steven Pietrzak. A jury held for defendants as to all
counts. Plaintiffs appeal, seeking either a new trial or an
evidentiary hearing to examine their claim that Rush's counsel 
committed prejudicial fraud on the court.
 We affirm. 
 On April 1, 1992, Steven Pietrzak suffered a cardiac arrest
during prostate surgery at Rush. The cardiac arrest caused
severe brain damage. Dr. Wu and UASC were the attending
anesthesiologists, and Dr. Wu intermittently supervised resident
Dr. Michael Fox's administration of anesthesiology for the
surgery. 
 On September 16, 1992, plaintiffs filed their complaint
against defendants, alleging that they negligently caused Mr.
Pietrzak's cardiac arrest. Patricia Pietrzak acted individually
and as daughter and next friend of Mr. Pietrzak, and Caroline
Pietrzak sought damages for loss of consortium. The complaint
alleged that defendants were responsible for deficient potassium
levels (hypokalemia) and blood volume levels (hypovolemia) in Mr.
Pietrzak, and that either or both of these deficiencies caused
his cardiac arrest.
 On January 6, 1994, a jury trial commenced on the complaint. 
Plaintiffs presented expert testimony that hypokalemia and/or
hypovolemia caused the cardiac arrest. Defendants presented
expert testimony that the arrest was caused by a sudden and
unpreventable event, either an air embolism or an adverse
reaction to the dye used in prostate surgery. On February 18,
1994, the jury returned a verdict in favor of defendants. 
 On March 11, 1994, plaintiffs filed a post-trial motion
requesting a new trial, and they filed an amended motion on
August 15, 1994. The amended motion alleged two improprieties
discovered only after the trial's completion. First, plaintiffs
claimed that they were prejudiced when two jurors consulted the
dictionary for definitions of "timely," a word that appeared
several times in the jury instructions referring to whether
defendants rendered medical care in a timely fashion. One juror
did not share her dictionary definition of "timely" - "occurring
at a suitable or opportune time; well-timed" - with other members
of the jury. The other juror did not find the definition of
"timely," but informed the jury of the following definitions:
"time - measure of duration" and "duration - a limit of time." 
Plaintiffs moved to introduce testimony by linguistic expert Dr.
Sadock on the possible prejudice that the definitions may have
caused. Dr. Sadock's affidavit stated:
 "[T]he post-trial motion raises an issue whether the jury's
 verdict was probably prejudiced by the introduction of
 extraneous dictionary definitions. *** I have indicated
 that, because it was a legal issue, it transcends the
 expertise of a linguist. *** [L]egal expertise is needed to
 understand ['probably' and 'prejudice'] and apply the legal
 test." 
The court denied plaintiffs' motion to allow Dr. Sadock's
testimony. On May 5, 1995, the court issued a written opinion
holding that the dictionary definitions at issue were ordinary,
neutral, and nonargumentative definitions that did not improperly
influence the jury, and, thus, the court denied the motion for a
new trial.
 The second alleged impropriety that plaintiffs discovered
post-trial was an alleged fraud on the court by Rush's counsel
regarding a videotape demonstration shown at trial. The two-
minute videotape was shown to the jury to inform it of the sights
and sounds that a medical device - a pulse oximeter - would
convey to Dr. Fox during surgery. Prior to the demonstration,
the following colloquy ensued:
 "MR. DAVIDSON (plaintiffs' counsel): Now, Mr. Achilles
 [Rush's clinical engineer], who produced the lists of the
 equipment said he could not say which [oximeter] it was. It
 was one of two, and he didn't know which.
 MR. SLAWKOWSKI (Rush's counsel): One of two types. Dr.
 Fox will testify that this was the type of oximeter that was
 being used.
 MR. DAVIDSON: The same model, same year, that sort of
 thing.
 MR. SLAWKOWSKI: Same type.
 MR. DAVIDSON: Well, I think it's required to show that
 if it was one of two, that he knows which it was, that it
 was the same year, it's not some subsequent year. That's
 why the foundation to be made, he will be obligated to lay.
 MR. SLAWKOWSKI: We'll lay it.
 * * *
 MR. DAVIDSON: I would simply ask that the witness lay
 the foundation rather than counsel, and that he establish
 these points that it's the same machine and so on.
 THE COURT: I'm curious to know what your expert has to
 say, but my view, based on all that I know about the case,
 is that it doesn't look like a reconstruction. It looks
 simply like giving us an opportunity to see how they look
 and sound, and so we'll see what Dr. Fox has to say." 
The videotape demonstration contained an Ohmeda 5250 monitor, and
plaintiffs claimed that this monitor differed materially from the
monitors that Mr. Achilles had testified might have been present
an Ohmeda 3700 or a Nellcor N-100. The Ohmeda 3700 and Nellcor
N-100 do not display continuous readouts of oxygen and carbon
dioxide, while the Ohmeda 5250 has this capability. The
videotape demonstration did not use these continuous readout
functions of the Ohmeda 5250, but Dr. Fox testified that he had
access to continuous readouts of oxygen and carbon dioxide during
the procedure, testimony that plaintiffs claimed was crucial. 
Plaintiffs' position is summarized as follows: (1) Rush's counsel
made a false representation of fact with his "same type" 
description of the videotape monitor; (2) this fraudulent
representation prevented plaintiffs from realizing that the
machine in the video was not the "same type" as in surgery; (3)
this misled plaintiffs into not challenging that the machine used
was an Ohmeda 5250; and (4) because plaintiffs were misled, they
lost the opportunity to impeach Dr. Fox's testimony on continuous
readouts with his own prior inconsistent statements or the
testimony of Mr. Achilles. Defendants responded that there was
no misrepresentation because the videotape demonstrated only the
features identical on all models, and that there was no prejudice
suffered by defendants. 
 The court denied plaintiffs' motion, holding that: (1) the
record established a strong likelihood that the Ohmeda 5250 was
actually used in the surgery; (2) any "misrepresentation" was
innocent, not fraudulent, because no one was fully apprised of
all the relevant facts; (3) plaintiffs did not reasonably rely on
any misrepresentation because they had full knowledge of Dr.
Fox's inconsistent deposition testimony and other impeaching
evidence; and (4) any error was not so prejudicial as to require
a new trial. The court did not answer whether counsel's "same
type" answer was a misrepresentation under the alleged
circumstances involving a demonstration of identical functions
with a different model. The court also denied a new trial based
on several alleged trial errors. Plaintiffs appeal the denial of
their motion for a new trial, alleging that they were denied a
fair trial through fraud by Rush's counsel, extraneous dictionary
definitions, improper conduct by defense counsels, and the
failure to give Illinois Pattern Jury Instruction, Civil No. 5.01
(3d ed. 1989) (hereinafter IPI Civil 3d) regarding the
destruction of evidence within a party's control.
ANALYSIS 
 I
 Plaintiffs first contend that fraud by Rush's counsel
entitles them to a new trial. A trial court's ruling that no
prejudicial error occurred is entitled to great weight on appeal,
and we will reverse the court's ruling only if the court abused
this discretion. Drews v. Gobel Freight Lines, Inc., 197 Ill.
App. 3d 1049, 1061, 557 N.E.2d 303 (1990). 
 Initially, we conclude that no misrepresentation by counsel
ever occurred. Plaintiffs' brief alleges, "Rush's counsel
represented that the videotape demonstrated 'the same type' as
Rush's clinical engineer [Mr. Achilles] had testified was used in
Pietrzak's surgery." (Emphasis added.) We review the relevant
colloquy: 
 "MR. DAVIDSON: Now, Mr. Achilles, who produced the
 lists of the equipment said he could not say which it was. 
 It was one of two, and he didn't know which.
 MR. SLAWKOWSKI: One of two types. Dr. Fox will testify
 that this was the type of oximeter that was being used.
 MR. DAVIDSON: The same model, same year, that sort of
 thing.
 MR. SLAWKOWSKI: Same type." (Emphasis added.)
Davidson's question on models and Slawkowski's answer of "same
type" both referred to Slawkowski's statement that "Dr. Fox will
testify that this was the type of oximeter that was being used."
(Emphasis added). Plaintiffs have never disputed that Dr. Fox
testified that an Ohmeda 5250 was the type of oximeter that was
being used and that it was the same model as shown in the
videotape. Indeed, plaintiffs expressly complain about Dr. Fox's
testimony regarding continuous readouts, which could only have
resulted from an Ohmeda 5250. Although plaintiffs claim that
Rush's counsel made a representation regarding the videotape and
Mr. Achilles' testimony, the record shows that counsel only
reiterated Mr. Achilles' testimony and made no representation
whatsoever regarding this testimony. It is true that Rush's
counsel did not volunteer that Mr. Achilles' testimony could
impeach Dr. Fox's coming foundation testimony, but counsel was
not required to advocate for both sides. There was nothing false
about the only representation that Mr. Slawkowski made, and,
thus, no fraud occurred in this matter. Because of our finding
that no misrepresentation ever occurred, we need not examine
plaintiffs' contention that the court was required to conduct
additional evidentiary hearings into their allegations of fraud. 
 Even assuming arguendo that counsel had made a
misrepresentation, we agree with all four of the court's reasons
for determining that such a misrepresentation would not require a
new trial. The trial court was in a far superior position to
determine whether a prejudicial fraud had been perpetrated on it.
See In re Application of the County Treasurer, 267 Ill. App. 3d
993, 999, 642 N.E.2d 741 (1994). The record provides support for
all four of the court's rationales, and we conclude that none of
the court's holdings constitutes an abuse of discretion. 
 II
 Plaintiffs next argue that the jury's consideration of two
dictionary definitions for "timely" was reversible error. While
evidence that the jury considered extraneous information can be
used to impeach the verdict, not every instance in which
unauthorized information reaches the jury results in reversible
error. Macias v. Cincinnati Forte, 277 Ill. App. 3d 947, 661
N.E.2d 472 (1996). The losing party must first prove that the
unauthorized information relates directly to an issue in the case
and may have improperly influenced the verdict. Macias, 277 Ill.
App. 3d at 950. "The burden then shifts to the prevailing party
to demonstrate that no injury or prejudice resulted." Macias, 277
Ill. App. 3d at 950. "Because the actual effect of the
extraneous information on the minds of the jury cannot be proved,
the standard to be applied is whether the conduct involved such a
probability that prejudice would result that [the trial] is to be 
deemed inherently lacking in due process." Macias, 277 Ill. App.
3d at 950. 
 Before analyzing the circumstances of this matter, we
respond to the plaintiff's assertion that "it is presumed that
any extraneous matter brought before the jury is misleading,
absent rebuttal by the proponent of the verdict." This
contention is incorrect; as we stated in Macias, "The losing
party [must first prove] that the unauthorized information
relates directly to an issue in the case and may have improperly
influenced the verdict." (Emphasis added.) Macias, 277 Ill. App.
3d at 950. Although plaintiffs cite four different authorities
for their assertion, we will respond directly to their reply
brief's citation of People v. Holmes, 69 Ill. 2d 507, 372 N.E.2d
656 (1978). Holmes stated:
 "Presumably there are many types of *** 'outside
 influence(s),' and we need not and do not discuss whether
 and in what types of situations a defendant might be
 required to show 'such a probability that prejudice will
 result that it is [to be] deemed inherently lacking in due
 process.' [Citation.] Here, the 'extraneous information'
 improperly brought to the jury's attention was in the nature
 of evidence with which the defendant had not been confronted
 at trial and which he had no opportunity to refute."
 (Emphasis added.) Holmes, 69 Ill. 2d at 516-17. 
Thus, Holmes held that the court could not presume prejudice from
all extraneous information, but that prejudice could be presumed
when the information was additional unconfronted evidence. 
Plaintiffs' other citations likewise fail to support their claim.
 When the jury consults outside sources for definitions of
words contained in jury instructions, the court must determine
whether the definitions conflict or substantially differ from the
instructions. See Macias, 277 Ill. App. 3d at 951. Where the
outside definitions do not contradict, nullify, or negate the
court's jury instructions, the error is harmless. See Macias, 277
Ill. App. 3d at 950-51 (dictionary definitions of "reasonable"
and "reasonable care" did not substantially differ from jury
instructions). 
 We first analyze the effect of the juror who did not share
her dictionary definition of "timely" - "occurring at a suitable
or opportune time; well-timed" - with other members of the jury. 
We agree with the trial court that this is a neutral, ordinary,
and nonargumentative definition of the word that does not
contradict the court's jury instructions. Although plaintiffs
contend that the juror's dictionary defined "opportune" to
indicate convenience to the actor, Webster's Collegiate
Dictionary 828 (1985) defines "opportune" as "suitable or
convenient for a particular occurrence" and "occurring at an
appropriate time." These definitions are not substantially
different from "timely," and we note that plaintiffs have not
alleged that the juror involved consulted her dictionary to
define "opportune." 
 We also agree with the court that the error was harmless
when another juror informed the jury of the definitions "time -
measure of duration" and "duration - a limit of time." 
Plaintiffs contend that this definition imposed an increased
burden to prove that defendants had failed to provide proper
medical care within a measurable "limit of time," whereas
plaintiffs were only required to prove that medical care was not
"timely." However, an examination of timeliness requires a
measurable limit of time. Moreover, plaintiffs have added the
term "measurable" to the dictionary definition without justifying
this additional adjective. Although plaintiffs attempt to cite
individual jurors as to how the definitions affected their
deliberations, evidence relating to the effect of outside
influences on the mental processes of jury members is
inadmissible. Holmes, 69 Ill. 2d at 514. Plaintiffs have not
demonstrated that the extraneous definitions may have improperly
influenced the verdict, and, thus, the trial court did not abuse
its discretion. 
 Lastly, we agree with the court's denial of expert
linguistic testimony on this issue. Even plaintiffs' expert
stated that legal expertise was necessary to understand the term
"prejudice" and apply the legal test. This court has repeatedly
held that language interpretation is a question of law for the
court so that expert linguistic testimony may be disallowed. Rusk
Aviation, Inc. v. Northcott, 151 Ill. App. 3d 126, 130, 502
N.E.2d 1309 (1986) (expert testimony disallowed concerning
statute); Dawe's Laboratories, N.V. v. Commercial Insurance Co.,
19 Ill. App. 3d 1039, 1050, 313 N.E.2d 218 (1974) (expert
testimony disallowed concerning contract). Whether an outside
dictionary definition contradicts a jury instruction is a
question of language interpretation, and, thus, the court's
ruling was proper. 
 III
 Plaintiffs next contend that several instances of improper
conduct by defense counsel require that we grant a new trial. 
Argument and conduct constitute reversible error only when they
are so prejudicial as to deprive the other party of the right to
a fair trial. Balzekas v. Looking Elk, 254 Ill. App. 3d 529, 535,
627 N.E.2d 84 (1993). The court's decision denying a new trial
on this basis will not be overturned absent a clear abuse of
discretion. Tierney v. Community Memorial General Hospital, 268
Ill. App. 3d 1050, 1061, 645 N.E.2d 284 (1994). 
 In most instances of the alleged misconduct, the court
sustained objections by plaintiffs and told the jury to disregard
defendants' statements. Under such circumstances there is
ordinarily no reason to believe that the jury was prejudiced.
Balzekas, 254 Ill. App. 3d at 535-36. Nevertheless, plaintiffs
are particularly critical of two questions that we will examine. 
The first involved an inquiry about medical insurance to
plaintiffs' expert on future expenses, but this expert introduced
an exhibit that stated, "medical insurance may be impossible to
obtain." Once defendants alerted the court to this statement,
the court revised its ruling and held that the question was not
improper, and we agree with the court's decision under these
circumstances. See Bass v. Washington - Kinney Co., 119 Ill. App.
3d 713, 729, 457 N.E.2d 85 (1983) (no error where plaintiff first
raised insurance issue). Defendants' other question introduced
post-occurrence medical opinion as to the proper standard of
care, but any possible prejudice was very limited in this case,
as even the plaintiffs' brief admits that "it was on the
causation issue that the case was hardest fought." As to
plaintiffs' other allegations, sustaining plaintiffs' objections
on these matters was curative enough so that the court's refusal
to grant a new trial was not a clear abuse of discretion. 
 The only alleged misconduct on which the court overruled
plaintiffs' objections was defendants' closing argument to limit
any award to the medical and caretaking expenses for Mr.
Pietrzak. However, because the jury never had occasion to
consider damages, any possible error would be irrelevant and not
prejudicial to plaintiffs. Lastly, plaintiffs complain of
comments during closing argument to which they made no objection,
but their failure to object has waived any error. Chiricosta v.
Winthrop - Breon, 263 Ill. App. 3d 132, 152, 635 N.E.2d 1019
(1994).
 IV
 Plaintiffs next claim that because Dr. Fox destroyed his
personal "trainee copy" of the anesthesia chart, the court erred
in denying plaintiffs' request for IPI Civil 3d No. 5.01
regarding the destruction of presumably favorable evidence within
a party's control. The decision whether to give IPI Civil 3d No.
5.01 is within the trial court's sound discretion and is
reversible only after a showing of clear abuse. Cleveringa v.
J.I. Case Co., 230 Ill. App. 3d 831, 855-56, 595 N.E.2d 1193,
(1992). 
 A party must satisfy four criteria to entitle it to IPI
Civil 3d No. 5.01, and one of these requirements is that the
requested evidence was in fact within the party's control.
Cleveringa, 230 Ill. App. 3d at 855. However, Dr. Fox was never
a party to this case. Although plaintiffs claim that it is
"indisputable" that Rush controlled Dr. Fox's personal copy, they
provide no logic or support for this contention. Plaintiffs'
reply brief introduces an agency theory of control, but
plaintiffs waived this argument by failing to include it in their
appellate brief. Obenland v. Economy Fire & Casualty Co., 234
Ill. App. 3d 99, 599 N.E.2d 999 (1992). Plaintiffs have not
explained how Rush had any control over Dr. Fox's personal copy
of the chart, and, thus, there is no showing of clear abuse by
the trial court. 
 V
 Lastly, plaintiffs claim that the jury's decision was
against the manifest weight of the evidence and that the court
erred in granting partial summary judgment against Patricia
Pietrzak on two counts. However, plaintiffs have not provided
any arguments or citations to support these claims. Supreme
Court Rule 341(e)(7) (145 Ill. 2d R. 341(e)(7)) provides that the
appellant's brief shall contain the contentions of the appellant
and the reasons thereof, with citations of authorities, and
plaintiffs have waived these contentions for their failure to
conform to appellate procedure. Pyskaty v. Oyama, 266 Ill. App.
3d 801, 822, 641 N.E.2d 552 (1994). Plaintiffs also admitted at
oral argument that they waived these claims, allowing us to
conclude this opinion in timely fashion. 
 For the foregoing reasons, the judgment of the trial court
is affirmed.
 Affirmed.
 McNULTY, P.J., and HOURIHANE, J., concur.