STATE OF NORTH CAROLINA v. SHAMAR RASHEED HINES AND
RODNEY EUGENE LEAK

No. COA97-1399

(Filed 1 December 1998)

**Constitutional Law— right of confrontation—unadmitted evidence—inadvertent publication to jury**

Defendants' rights of confrontation were violated in a trial for murder and aggravated assault by the inadvertent publication to the jury of portions of the prosecutor's case file which had not been admitted into evidence, including handwritten notes and a typewritten list of statements allegedly made by defendants which implicated both defendants in the crimes and which appeared to state one defendant's record of drug-related convictions. Furthermore, the prejudicial effect of the evidence inadvertently published to the jury was not cured by the trial court's instruction that the jury should disregard such evidence where jurors could not recall what information they retained from these documents and what information they were being asked to exclude; an accomplice was not identified as the source of the information in the documents and it may have appeared to jurors that an unknown witness corroborated the accomplice's trial testimony; and evidence of defendants' guilt was not overwhelming. U.S. Const. amend. VI; N.C. Const. art. I, § 23.

Appeal by defendants from judgments dated 29 October 1996 by Judge Orlando F. Hudson in Durham County Superior Court. Heard in the Court of Appeals 15 September 1998.

*Attorney General Michael F. Easley, by Assistant Attorney General John F. Maddrey, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Charlesena Elliott Walker, for defendant-appellant Shamar Rasheed Hines.*

*Jay H. Ferguson, for defendant-appellant Rodney Eugene Leak.*

GREENE, Judge.

Shamar Rasheed Hines (Hines) and Rodney Eugene Leak (Leak) (collectively, Defendants) appeal from entry of judgments on a jury verdict finding them each guilty of assault with a deadly weapon inflicting serious injury and of first-degree murder.

At trial, Antoinette Atwater (Atwater) testified that she, her two-year-old daughter (Shaquana), Antonio Smith (Smith), and a few others were sitting on the back porch of her apartment building on the evening of 22 October 1994. Atwater and the others had been smoking a marijuana cigarette laced with cocaine "and getting high" when she noticed a "heavy-set dude . . . and another guy" walking toward them. Atwater heard gunshots and testified that "it did look like both men were firing weapons." After the shooting ended, Atwater realized that Shaquana had been wounded. Shaquana was still breathing when the police and medical help arrived, but died within ten to fifteen minutes of her arrival at the emergency room. Shortly after the incident, Atwater picked Tony Johnson (Johnson) out of a photographic line-up and identified him as one of the shooters. A few weeks prior to trial, Atwater identified Leak as the second shooter.

Tora Bostic (Bostic) testified that she was sitting on her porch with two friends when Johnson walked over and asked her if Smith was in the group sitting on a porch farther down the complex. After Bostic replied that it was, Johnson walked back around the corner of her apartment building in the direction in which he had come. Bostic then walked around the building in the same direction to get to the front of her apartment. She saw Johnson, Leak, and Hines standing beside the building as she walked around it. Johnson appeared to be holding a revolver. Bostic testified that the three men did not appear to be conversing with each other. Shortly after she entered her apartment, she heard several shots, and she remained inside until the shoot-out ended.

Smith testified that he sold drugs for a living. Smith stated that Johnson had approached him earlier on the afternoon of 22 October

STATE v. HINES

[131 N.C. App. 457 (1998)]

1994 seeking drugs. Johnson "owed me some money, and he had came up, you know, wanting some more stuff. And I wouldn't give it to him because he ain't paid me my money from the last time, and, you know, we got in a little argument." Smith testified that about an hour or two later, while he was sitting with a group of people, two men began firing in his direction. Smith received three gunshot wounds during the shoot-out. On the way to the hospital, Smith told emergency medical personnel in the ambulance that he did not know who had shot him. Smith subsequently identified Johnson as one of the shooters, but could not identify the second shooter.

Johnson testified for the State that he sold cocaine, heroin, and marijuana for Leak (a.k.a. "Smoke"), that he and Hines (a.k.a. "Rock") had engaged in the use of cocaine, crack, and heroin, and that he had seen both Leak and Hines with guns in the past. Johnson testified that he was stopped by Smith and two other men on the afternoon of 22 October 1994. Smith "put a gun to my head and demanded money and drugs." Johnson stated that he gave Smith "close to $500 and about seven bags of drugs," and that he went to his apartment after the altercation ended. Johnson contacted Hines and Leak, and the three men drove to the vicinity of Johnson's recent encounter with Smith. They stopped on the way and Hines went inside an apartment building and returned with a gun. Leak and Johnson each already had guns with them. When Johnson, Hines, and Leak arrived at the area near Johnson's apartment, Smith was sitting in a group on a nearby porch. Johnson testified that he, Hines, and Leak pulled hoods over their heads and went towards Smith. Smith fired at Johnson, Hines, and Leak, each of whom returned fire several times before fleeing the scene.

Following Johnson's testimony, over forty exhibits which had been admitted into evidence as part of the State's case were published to the jury. Included within these exhibits were portions of the prosecutor's case file which had *not* been admitted into evidence. The evidence reveals, and the trial court found, that the inclusion of these materials with the admitted exhibits was inadvertent. Among the papers inadvertently published to the jury were eight pages of the prosecutor's handwritten notes from his interview with Johnson and two pages of a typewritten transcription of statements Johnson alleged Defendants had made to others. The prosecutor's handwritten notes of the Johnson interview were not labeled or otherwise identified as such, and the typewritten transcription of comments allegedly made by Defendants did not identify Johnson as its source.

The prosecutor's handwritten notes from his interview with Johnson contained the following pertinent notations following Hines' name: " 'Rock' . . . drugs—12 years IV; speed; 15 years II"; "crazy—beat him over $." The prosecutor's notes also contained information about Leak, or "Smoke," as follows: "Smoke didn't want to give money out, would give drugs"; and "Smoke—didn't do drugs—only a little." On the same pages were the following additional notations: "coke party . . . 1/8 kilo —crack & powder"; "Rock came back with .357"; as well as several quotations listed after the initials "RL" (*i.e.*, Leak's initials) and "RH" (*i.e.*, Hines' initials) in the form of a transcript. Attributed to "RL" were comments such as: "Let me have the pistol"; "Dude put girl in front of him"; and "You going to take care of this or I am going to f— you up." Attributed to "RH" were comments such as: "What did he do?" and "page Smoke." The prosecutor's notes contained a diagram drawn by hand labeled "Shoot Out" which placed the initials RH, RL, TJ (*i.e.*, Johnson's initials), and the name Smith at their alleged respective locations between what appear to be representations of buildings. The prosecutor's notes also contained the following circled information: "Other times RL shot"; "he can get people to do things for him"; and "master plan—knows we are all down."

The papers handed to the jury also contained two typewritten sheets, one labeled "Oral Statements Made to Non-Law Enforcement Witness by Rodney Leak," and one labeled "Oral Statements Made to Non-Law Enforcement Witness by Shamar Hines." Typewritten statements attributed to Hines included: "I got a gun"; "What we going to do about this?"; "I'm down for it"; and "We all down." Typewritten quotations attributed to Leak included: "We have pistols"; "You can show him to me, you don't have to shoot anybody"; "We gone take care of this dude"; and "He ain't going to get away with this s—."

Approximately twenty to thirty minutes after the evidence had been published to the jury, the prosecutor noticed that the jury was reviewing materials which had not been admitted into evidence, immediately had a deputy retrieve the documents, and promptly brought the situation to the trial court's attention. Defendants each moved for a mistrial.

The trial court found that "none of these handwritten notes have anything to do with Mr. Leak." Because the trial court found that the notes did refer to Hines, however, the jurors were individually shown the prosecutor's handwritten notes and polled as to whether they had

seen the notes, and, if they had, whether they could put the contents of those notes out of their minds. Several jurors testified that they had not seen the notes. Juror Number One stated that he had tried to read the notes, but could not decipher the prosecutor's handwriting. He stated that he "couldn't understand it," and that he would be able to put it out of his mind. Juror Number Two stated that he had reviewed the prosecutor's handwritten notes. When asked if he retained any information from that document, he stated: "No, it was pretty difficult to read, and with all due respect, it was difficult to read that. But I did read it, and I did not come away with anything." He further stated that he could put it out of his mind. Juror Number Three stated that he "did run through it." When asked whether he retained any information from the prosecutor's notes, he stated: "Not a lot." He further stated that he thought he could put any information he had retained out of his mind. Juror Number Four "remember[ed] seeing that." The trial court then asked if she had retained any information from the prosecutor's notes.

Juror #4: There was so much of all the other documents, I really—

Court: Yeah, I want to know about this document specifically. Did you retain any information about that document?

Juror #4: Not specifically, no.

Juror Number Four further stated that although she did not specifically retain information from the prosecutor's notes, she could put the notes out of her mind.

The trial court did not poll the jurors as to the typewritten statements allegedly made by Defendants, instead finding that the substance of those statements were testified to by Johnson and thus were already before the jury. The trial court did not make clear to the jurors that Johnson was the source of the prosecutor's handwritten notes and the typewritten statements. The trial court denied Defendants' motions for mistrial.

Hines did not testify or present any evidence. Leak did not testify, but did present evidence tending to show that Johnson had told a fellow inmate that Leak did not participate in the shoot-out, and that Hines did participate. Another inmate testified that Johnson had told him that Leak "was on the other side of the building" when the shootout occurred, and that Johnson had said that "if he going down, he's taking all them [(*i.e.*, Leak and Hines)] down with him." In an attempt

to impeach Atwater's identification of him as one of the shooters, Leak also presented evidence that Atwater recognized him based on events unrelated to the shoot-out.

The jury subsequently found both Hines and Leak guilty of the assault with a deadly weapon inflicting serious injury on Smith, and with the first-degree murder of two-year-old Shaquana during the commission of a felony.

The issue is whether the publication to the jury of extrinsic materials was substantially and irreparably prejudicial to Hines and Leak.

The Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution guarantee a criminal defendant's right to confront the witnesses and evidence against him. U.S. Const. amend. VI; N.C. Const. art. I, § 23; *State v. Lyles*, 94 N.C. App. 240, 247, 380 S.E.2d 390, 394-95 (1989). "A fundamental aspect of [this right to confrontation] is that a jury's verdict must be based on *evidence produced at trial*, not on extrinsic evidence which has escaped the rules of evidence, supervision of the court, and other procedural safeguards of a fair trial." *Id.* (citing *Parker v. Gladden*, 385 U.S. 363, 364, 17 L. Ed. 2d 420, 422-23 (1966)).

In this case, it is undisputed that the jury was exposed to extrinsic evidence. The prosecutor's notes and a typewritten list of statements allegedly made by Defendants were inadvertently published to the jury without being admitted by the trial court. These documents contained generally inadmissible information, notably hearsay testimony implicating both Hines and Leak in the shoot-out, *see* N.C.G.S. § 8C-1, Rules 802 through 805 (1992), and what appeared to be Hines' criminal record of drug-related convictions, *see* N.C.G.S. § 8C-1, Rule 404(b) (Supp. 1997); *State v. Foster*, 27 N.C. App. 531, 533, 219 S.E.2d 535, 537 (1975). Defendants' confrontational rights were therefore violated by the publication of these documents to the jury.

Appropriate instructions from the trial court, however, may cure even constitutional errors. "[O]ur system of justice is based upon the assumption that trial jurors are women and men " 'of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so." ' " *State v. Hartman*, 344 N.C. 445, 472, 476 S.E.2d 328, 343 (1996) (quoting *State v. Moore*, 276 N.C. 142, 149, 171 S.E.2d 453, 458 (1970)), *cert. denied*, —— U.S. ——, 137 L. Ed. 2d 708 (1997). Accordingly, our courts have generally held that where inadmissible evidence is published to

the jury, a trial court may cure this error by instructing the jury not to consider that specific evidence. *State v. Smith*, 301 N.C. 695, 697, 272 S.E.2d 852, 854-55 (1981). In some cases, however, "the cautionary admonitions of the trial judge are ineffective to erase from the minds of a jury the effects of prejudicial [errors]." *Foster*, 27 N.C. App. at 533, 219 S.E.2d at 537.

In this case, the instructions of the trial court were insufficient to cure the prejudicial effect of the evidence inadvertently published to the jury. The trial court's questioning of the jurors as to the prosecutor's handwritten notes revealed that some of the jurors had read the notes while reviewing over forty documents, but that they could not specifically recall what information they had retained from the notes. Although the jurors stated that they could exclude inadmissible material from their minds, some jurors could not specifically recall what information they were being asked to exclude, and therefore faced an impossible task. Furthermore, the trial court did not instruct the jury to disregard the typewritten list of statements allegedly made by Leak and Hines which was also inadvertently published to the jury. Finally, it could have appeared to a reasonable juror that at least one unknown witness corroborated Johnson's testimony, because neither the trial court nor the documents themselves indicated that Johnson was the source of the information contained therein. The trial court's admonition to the jurors to exclude any information they may have retained from their review of the prosecutor's handwritten notes was insufficient to cure these errors.

Constitutional errors that have not been cured by the trial court are presumed prejudicial under North Carolina law; however, the State may rebut this presumption by showing that the error was harmless beyond a reasonable doubt. *Lyles*, 94 N.C. App. at 248, 380 S.E.2d at 395; *see* N.C.G.S. § 15A-1443(b) (1997). To do so, the State must show that there is no reasonable possibility that the error complained of contributed to the conviction. *State v. Heard and Jones*, 285 N.C. 167, 172, 203 S.E.2d 826, 829 (1974) (noting that overwhelming evidence of a defendant's guilt may render a constitutional error harmless beyond a reasonable doubt).

In this case, the State has failed to show that the publication to the jury of the prosecutor's notes and the typewritten list of statements allegedly made by Hines and Leak was harmless beyond a reasonable doubt. The jury viewed what appeared to be Hines' arrest record and statements tending to show that Hines had a history of

violence—information which was not otherwise before the jury. The jury also viewed statements and a diagram implicating both Hines and Leak in the shoot-out, and was never made aware that Johnson was the source of this information. Furthermore, there was not overwhelming evidence of the guilt of either Hines or Leak. Although other testimony placed Hines in the vicinity immediately preceding the shoot-out, Johnson's testimony was the only evidence that implicated Hines as an actual participant in the shoot-out (Johnson testified that he, Hines, and Leak returned Smith's fire). Smith, who was shot during the exchange, testified that there were two shooters, and he could only identify Johnson. Atwater, Shaquana's mother, testified that there were two shooters and identified Johnson within days of the shooting. She was unable to identify Leak, however, until approximately two years later. Although neither Hines nor Leak testified, Leak presented evidence that tended to impeach both Johnson's testimony and Atwater's identification. Accordingly, the State has not shown that the inadvertent publication of extrinsic evidence was harmless beyond a reasonable doubt, and has failed to convince this Court that there is no reasonable possibility that the publication to the jury of these documents contributed to the convictions of Hines and Leak. Under these circumstances, Defendants were substantially and irreparably prejudiced by the publication to the jury of extrinsic evidence; it was therefore an abuse of the trial court's discretion to deny Defendants' motions for mistrial. *See* N.C.G.S. § 15A-1061 (1997) (noting that on a defendant's motion, the trial court must declare a mistrial "if there occurs during the trial an error or legal defect in the proceedings . . . resulting in substantial and irreparable prejudice to the defendant's case"); *State v. Williamson*, 333 N.C. 128, 138, 423 S.E.2d 766, 772 (1992). This error requires that we grant Defendants a new trial; we therefore do not address Defendants' remaining contentions as they may not recur.

New Trial.

Judges TIMMONS-GOODSON and SMITH concur.