STATE OF NORTH CAROLINA v. WILLIAM THOMAS BAUBERGER

No. COA04-1368

(Filed 7 March 2006)

## 1. Jury— juror misconduct—motion for appropriate relief— improper consideration of dictionary definitions—extraneous information under Rule 606(b)—right to confrontation

The trial court did not err in a second-degree murder and assault with a deadly weapon inflicting serious injury case by denying defendant's motion for appropriate relief seeking a new trial based on juror misconduct arising from the fact that jurors considered dictionary definitions during deliberations, even though defendant contends the juror affidavits contain extraneous information and that his Sixth Amendment right to confrontation was violated, because: (1) although the jury's conduct was improper, the jury's use of the dictionary did not prejudice defendant when there was no reasonable possibility that the verdict would have been different absent the jury consulting the dictionary; (2) definitions in standard dictionaries are not within our Supreme Court's contemplation of extraneous information under N.C.G.S. § 8C-1, Rule 606(b); and (3) the reading of the dictionary definitions did not violate defendant's right to confrontation when the information considered by the jury did not discredit defendant's testimony or witnesses, and it concerned legal terminology rather than evidence developed at trial.

## 2. Sentencing— prior record level—prior driving while impaired convictions

The trial court did not err in a second-degree murder and assault with a deadly weapon inflicting serious injury case by using defendant's prior driving while impaired convictions in determining his prior record level and sentencing him as a Level II offender, because: (1) although defendant contends his sentence as a Level II offender violates the prohibition against double jeopardy, he failed to cite any supporting case authority; (2) defendant's prior convictions were not aggravating factors, but instead the trial court added points to defendant's prior record level under N.C.G.S. § 15A-1340.14; and (3) the parties do not cite any provisions of the Structured Sentencing Act, nor did the Court of Appeals find any, that prohibited a trial court from using the same prior convictions introduced by the State as

evidence of malice during trial to increase defendant's prior record level at sentencing.

Judge GEER dissenting.

Appeal by defendant from judgment entered 15 August 2003 by Judge John O. Craig, III in Forsyth County Superior Court. Heard in the Court of Appeals 17 August 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Patricia A. Duffy and Special Counsel Isaac T. Avery, III, for the State.*

*Kathryn L. VandenBerg for defendant-appellant.*

ELMORE, Judge.

William Bauberger (defendant) was indicted for second-degree murder and assault with a deadly weapon inflicting serious injury. At trial, the State's evidence tended to show that on 3 February 2002 a vehicle operated by defendant collided with a vehicle operated by William Foy. At approximately 8:15 p.m. on 3 February Mr. Foy was driving a Geo Metro on Highway 421 near the Lewisville/Clemmons exit with his wife, Carol Foy, in the passenger seat. Defendant was driving a Cadillac with a Flow Chevrolet dealer's tag. Defendant had attended a Super Bowl party where he consumed in excess of ten beers. While driving, defendant called Andrea True, a friend from work, and told her that he was coming over to her house. Defendant began driving down the Lewisville/Clemmons exit ramp in the wrong direction. There were signs indicating "Do Not Enter" and "Wrong Way."

Audrey Borger testified that she was driving up the Lewisville/Clemmons exit from Highway 421 and saw a car coming straight at her. She blew her horn and then swerved over to avoid a collision. Melissa Borger, Audrey Borger's daughter, testified that she was riding as a passenger in her mother's car when she saw a vehicle coming at them at a speed of over 45 miles per hour and that the driver was accelerating. Jeffrey Hinshaw testified that he was driving on Highway 421 and saw a vehicle's headlights coming down the exit ramp at him. Mr. Hinshaw stated that the vehicle appeared to be weaving and was traveling at over 55 miles per hour. Mr. Hinshaw testified that he slowed down and pulled his car into the breakdown lane and then heard a crash shortly thereafter.

**STATE v. BAUBERGER**

[176 N.C. App. 465 (2006)]

Mr. Foy testified that he observed a vehicle coming the wrong way down the exit ramp and that he tried to brake and swerve onto the shoulder of the road. After the cars collided, Mr. Foy checked on his wife but could not find a pulse. Mr. Foy got out of the car after several attempts but was unable to walk because of a broken leg. Mr. Hinshaw, the chief physician's assistant in the emergency department at Baptist Hospital, testified that he heard the crash and went over to help. Mr. Hinshaw reached Mr. Foy first, who asked Mr. Hinshaw to check on his wife. Mr. Hinshaw found Mrs. Foy unresponsive and with no pulse. When he arrived at the second car, Mr. Hinshaw observed that defendant was slumped back in his seat and appeared sleepy. Defendant responded to Mr. Hinshaw's sternal rub confirming defendant was not unconscious. Mr. Hinshaw detected an odor of alcohol. Stanley Lee testified that he lives near the scene of the crash and that he arrived after hearing the crash. Mr. Lee noticed that defendant had a strong odor of alcohol. State Trooper Daniel Harmon testified that he spoke to defendant in the back of the ambulance and that defendant slurred his last name. Trooper Harmon stated that defendant's eyes were red and glassy and that defendant appeared to be impaired.

Mrs. Foy suffered traumatic injuries to her head, chest, internal organs, and arms and legs. She died within minutes of the crash. Mr. Foy was transported to Baptist Hospital, where he was treated for a broken left hand, and a tibia fracture and bone fragments in his right leg that required reconstructive surgery and seven screws. Defendant was also treated at Baptist Hospital. While there, defendant told the mother of his child, "I really f—— up, they're going to give me the needle, I killed someone tonight, I'm going away forever, I want to see my child[.]" Defendant called his co-worker Andrea True and told her that he had killed someone and that he wished it had been him.

Defendant testified at trial. He stated that he had consumed more than ten beers over the course of five or five and one-half hours on the day of the collision. Defendant admitted that he had been ordered by a court to surrender his license a few months prior to the crash. Defendant testified that he knew that he was impaired when he drove but did not remember going the wrong way on the exit ramp. Prior to trial, defendant had stipulated to the fact that his driver's license was revoked at the time of the crash for a driving while impaired conviction in Guilford County. Defendant had also stipulated that his blood/alcohol concentration was .20 grams per 100 milliliters of whole blood.

The jury returned verdicts of guilty on the charges of second-degree murder and assault with a deadly weapon inflicting serious injury. The trial court sentenced defendant on 15 August 2003. Later that day, the State informed the trial court that one of the jurors may have consulted a dictionary about the meaning of the word "malice." On 18 August 2003 defendant filed a Motion for Appropriate Relief seeking a new trial. In its response to defendant's motion, the State attached affidavits of ten jurors. Juror Collins stated that he looked up the word "malice" at home prior to the final jury charge and that he could not remember during the deliberations what the definition said and did not share it with anyone on the jury. The jury foreman stated that he checked out a copy of Webster's New Collegiate Dictionary during lunch break of the deliberations, brought it back to the jury room, and shared with the jury the definitions of "recklessly," "wantonly," "manifest," "utterly," and "regard." Following a hearing, the trial court denied defendant's motion. Defendant appeals his conviction and sentence for second-degree murder and also the denial of his Motion for Appropriate Relief.

I.

**[1]** First, defendant contends that he is entitled to a new trial because jurors improperly considered dictionary definitions during deliberations. In the Motion for Appropriate Relief to the trial court, defendant raised the constitutional argument that the jury's conduct violated his Sixth Amendment rights to an impartial jury and to confront the witnesses against him. We review the trial court's order denying a motion for appropriate relief to determine whether the findings of fact are supported by the evidence, the findings support the conclusions of law, and the conclusions support the trial court's order. *State v. Stevens*, 305 N.C. 712, 720, 291 S.E.2d 585, 591 (1982). "The determination of the existence and effect of jury misconduct is primarily for the trial court whose decision will be given great weight on appeal." *State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991) (quoting *State v. Gilbert*, 47 N.C. App. 316, 319, 267 S.E.2d 378, 379 (1980)).

The trial court reviewed the affidavits submitted by the ten jurors and entered findings based upon this evidence. In pertinent part, the trial court found that the jury foreman went to the Forsyth County Public Library during lunch break of the jury deliberations and checked out Webster's New Collegiate Dictionary (1953 edition). The foreman, Mr. Kuley, brought the dictionary to the jury room and read

STATE v. BAUBERGER

[176 N.C. App. 465 (2006)]

the following definitions of words contained within the trial court's definition of "malice":[1]

| | |
|---|---|
| "recklessly" | "lack of due caution" |
| "wantonly" | "arrogant recklessness of justice or the feelings of others" |
| "manifest" | "show" |
| "utterly" | "fully, totally" |
| "regard" | "respect or consideration for" |

In addition, the trial court found that Juror Collins looked up the word "malice" in a pocket dictionary at home prior to deliberations but did not bring a copy of the definition to the jury room. The trial court entered an order determining, *inter alia*, that although the jury's conduct was improper, the jury's use of the dictionary did not prejudice defendant and there is no reasonable possibility that the verdict would have been different absent the jury consulting the dictionary.

In general, a trial court may not receive juror testimony to impeach a verdict already rendered. *See State v. Costner*, 80 N.C. App. 666, 669, 343 S.E.2d 241, 243, *disc. review denied*, 317 N.C. 709, 347 S.E.2d 444 (1986). However, exceptions to this rule are found in N.C. Gen. Stat. § 15A-1240 and N.C. Gen. Stat. § 8C-1, Rule 606(b). Section 15A-1240 states that the testimony of a juror may be received to impeach the verdict when it concerns "[m]atters not in evidence which came to the attention of one or more jurors under circumstances which would violate the defendant's constitutional right to confront the witnesses against him[.]" N.C. Gen. Stat. § 15A-1240 (2003). Section 15A-1240 is applicable to criminal cases only. *See Smith v. Price*, 315 N.C. 523, 534, 340 S.E.2d 408, 415 (1986). Rule 606(b) of the North Carolina Rules of Evidence provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict or indictment or

---

1. The trial court instructed the jury that "[m]alice arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberatly bent on mischief."

> concerning his mental processes in connection therewith, except that a juror may testify on the question whether *extraneous prejudicial information* was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

N.C. Gen. Stat. § 8C-1, Rule 606(b) (2003) (emphasis added). Our Supreme Court has interpreted extraneous information under Rule 606(b) as "information dealing with the defendant or the case which is being tried, which information reaches a juror without being introduced in evidence." *State v. Rosier*, 322 N.C. 826, 832, 370 S.E.2d 359, 363 (1988).

Defendant contends that the dictionary definitions read to the jury by the foreman were extraneous information within the meaning of Rule 606(b) because the definitions were directed toward the governing law of the case. Defendant cites to *State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44 (1997), *cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). In *Barnes,* our Supreme Court held that the trial court did not abuse its discretion in not inquiring into prejudice to the defendant where a juror read aloud from the Bible in the jury room prior to the trial court's instructions to the jury. *Id.* at 228, 481 S.E.2d at 68. The Court explained that the information from the Bible was not an extraneous influence upon the jury because there was no evidence that the reading was directed to "the facts or governing law at issue in the case[.]" *Id.*

In arguing that the dictionary definitions were not extraneous information and thus the affidavits of the jurors were not admissible to impeach the verdict, the State relies upon the reasoning of the dissenting opinion in *Lindsey v. Boddie-Noell Enters., Inc.*, 147 N.C. App. 166, 555 S.E.2d 369 (2001), reversed *per curiam* for the reasons stated in the dissenting opinion, 355 N.C. 487, 562 S.E.2d 420 (2002). In *Lindsey*, a juror consulted a dictionary for the definitions of "willful" and "wanton" during deliberations in a case where the jury was deciding whether to award punitive damages against the defendant based upon willful and wanton conduct. *Lindsey*, 147 N.C. App. at 169, 555 S.E.2d at 372. The jury did not award punitive damages to the plaintiff, and the plaintiff made a motion for a new trial. *Id.* This Court held that the trial court erred in failing to grant a new trial because the plaintiff was prejudiced by the jury misconduct. *Id.* at 174, 555 S.E.2d at 375. In a dissenting opinion, Judge Tyson concluded

that the contents of the juror affidavits submitted to the trial court were not extraneous information under Rule 606(b).

> The majority opinion states that it is "apparent" that the definitions of "willful" and "wanton" in a case involving a claim for punitive damages constitutes "extraneous information" because they pertain to the case being tried and the governing law at issue. I find the reading of the dictionary definitions by Juror Couch is analogous to a situation where one of the jurors informs the jury what "willful" and "wanton" mean, according to his knowledge of the English language. The definition of words in our standard dictionaries has been considered a matter of common knowledge which the jury is supposed to possess.

*Id.* at 179, 555 S.E.2d at 378.

The dissenting opinion in *Lindsey*, as adopted by our Supreme Court, cites to *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), and *Berrier v. Thrift*, 107 N.C. App. 356, 420 S.E.2d 206 (1992), in concluding that definitions in standard dictionaries are not within our Supreme Court's contemplation of extraneous information. Both *Robinson* and *Berrier* addressed the distinction between internal and external influences on the jury. In *Robinson*, one or more jurors stated in affidavits that they considered the possibility of parole in determining whether the defendant should receive a life sentence. *Robinson*, 336 N.C. at 124, 443 S.E.2d at 329. The trial court concluded, and our Supreme Court agreed, that discussions of parole eligibility are internal influences upon the jury coming from the jurors themselves. *Id.* at 124-25, 443 S.E.2d at 329-30. Accordingly, the Court held that the trial court correctly denied the defendant's motion for appropriate relief where the affidavits could not be used to impeach the verdict under Rule 606(b). *Id.* at 124-25, 443 S.E.2d at 329. In *Berrier*, juror affidavits revealed that the jury foreman incorrectly stated during deliberations that a punitive damages award is an award of symbolic value rather than a collectible money judgment. *Berrier*, 107 N.C. App. at 362, 420 S.E.2d at 210. This Court held that the trial court properly excluded the affidavits under Rule 606(b) because the information allegedly received by the jury was from an internal source, the jury foreman's impression of the effect of a punitive damages award. *Id.* at 365-66, 420 S.E.2d at 210-12.

In both *Robinson* and *Berrier*, the affidavits were inadmissible under Rule 606(b) where the jurors drew upon their own beliefs or ideas, not an outside source of information. *See also State v.*

*Quesinberry*, 325 N.C. 125, 135-36, 381 S.E.2d 681, 688 (1989) (no allegation that jurors received information about parole from outside source; affidavits stating that jurors believed the defendant would be released in ten years not admissible under Rule 606(b)). Here, the information was from an outside source and not merely a belief or impression of the jury foreman. The information concerned the definitions of words within the court's instruction on malice, an element of the second-degree murder offense being tried. The information in the affidavits, therefore, appears to be within the exception for extraneous information stated in Rule 606(b). *See Rosier*, 322 N.C. at 832, 370 S.E.2d at 363 (extraneous information includes information about the case being tried). However, we are bound by the reasoning of *Lindsey*. As the affidavits attest to the reading of standard dictionary definitions, the matters in the affidavits are not extraneous information under Rule 606(b). *See Lindsey*, 355 N.C. at 487, 562 S.E.2d at 420 (adopting the dissent in *Lindsey*, 147 N.C. App. 179, 555 S.E.2d 378).

Defendant next contends that the jury's consultation of dictionary definitions violated his Sixth Amendment right to confront witnesses against him and that the affidavits may be used to impeach the verdict pursuant to N.C. Gen. Stat. § 15A-1240. We agree with defendant that *Lindsey*, a civil case, is not controlling on this point because it does not discuss N.C. Gen. Stat. § 15A-1240, a provision of the Criminal Procedure Act. Indeed, in *State v. Rosier*, a criminal case where the defendant submitted juror affidavits in support of his motion for appropriate relief, our Supreme Court independently analyzed whether the juror affidavits should have been considered pursuant to Section 15A-1240 and pursuant to Rule 606(b). *See Rosier*, 322 N.C. at 832, 370 S.E.2d at 362-63. Nonetheless, we do not agree with defendant that the reading of the dictionary definitions in the case *sub judice* violated his right to confrontation.

"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *State v. Nobles*, 357 N.C. 433, 435, 584 S.E.2d 765, 768 (2003) (internal quotations omitted). Thus, the Sixth Amendment provides the criminal defendant the right to confront witnesses and evidence against him. *See, e.g., State v. Lyles*, 94 N.C. App. 240, 247, 380 S.E.2d 390, 394-95 (1989). In *Lyles*, the jury improperly peeled back paper that was covering a notation on a photographic exhibit, revealing that the defendant had been present at the police station on a date when his alibi witnesses testified that the defendant lived in another

state. *Id.* at 243, 380 S.E.2d at 392. This Court considered the circumstances under which the jury received this information and concluded that the defendant's right to confrontation was violated.

> In this case, it is undisputed that information about the defendant, which had not been admitted into evidence, came to the attention of the jury and that this evidence directly contradicted defendant's alibi witnesses. Because this exposure occurred during the jury's deliberations, defendant had no opportunity to challenge the evidence by cross-examination or to minimize its impact in his closing argument or through a curative instruction by the trial judge. Moreover, the evidence implied that defendant had prior criminal involvement, and the jury was allowed to draw this inference notwithstanding that this is a subject intricately regulated by the rules of evidence.

*Id.* at 247, 380 S.E.2d at 395. Here, the information considered by the jury did not discredit defendant's testimony or witnesses; it concerned legal terminology, not evidence developed at trial. Under these circumstances, the juror misconduct did not violate defendant's right to confrontation. *Cf. State v. Hines*, 131 N.C. App. 457, 508 S.E.2d 310 (1998) (defendant's right to confrontation violated where prosecutor's notes and typewritten list of statements defendant made, including hearsay statements, were mistakenly published to the jury without being admitted into evidence). We hold that the trial court did not err in concluding that the affidavits did not contain extraneous information and that defendant's right to confrontation was not violated by the juror misconduct.

II.

[2] Defendant also assigns error to the trial court's use of prior driving while impaired convictions in determining his prior record level and sentencing him as a Level II offender. Defendant concedes that he failed to object to the determination of prior record level at trial, but he correctly notes that the issue of the validity of his sentence is deemed preserved under N.C. Gen. Stat. § 15A-1446(d)(18) (2003). *See, e.g., State v. Robertson*, 161 N.C. App. 288, 292, 587 S.E.2d 902, 905 (2003).

Defendant argues that his sentence as a Level II offender violates the prohibition against double jeopardy but cites no supporting case authority. We, therefore, do not address this argument. *See* N.C.R. App. P. 28(b)(6) ("The body of the argument shall contain citations of the authorities upon which the appellant relies."). Defendant also

argues that his sentence as a Level II offender violates N.C. Gen. Stat. § 15A-1340.16, which provides as follows:

> Evidence necessary to prove an element of the offense shall not be used to prove any factor in aggravation, and the same item of evidence shall not be used to prove more than one factor in aggravation.

N.C. Gen. Stat. § 15A-1340.16(d) (2003). Interpreting this section of the Structured Sentencing Act, this Court has held that proof of an element of an offense may not be used to also prove an aggravating factor. *See State v. Corbett*, 154 N.C. App. 713, 717-18, 573 S.E.2d 210, 214 (2002). Here, defendant's prior convictions were not aggravating factors. Rather, the trial court added points to defendant's prior record level pursuant to N.C. Gen. Stat. § 15A-1340.14.

The parties do not cite any provision of the Structured Sentencing Act, nor do we find any, that prohibits a trial court from using the same prior convictions introduced by the State as evidence of malice during trial to increase the defendant's prior record level at sentencing. In contrast, the General Assembly has specifically prohibited a trial court from using prior convictions to increase a defendant's prior record level where those prior convictions are also used to establish the offense of being an habitual felon. *See* N.C. Gen. Stat. § 14-7.6 (2003) ("In determining the prior record level, convictions used to establish a person's status as an habitual felon shall not be used."); *State v. Truesdale*, 123 N.C. App. 639, 642, 473 S.E.2d 670, 672 (1996) (plain language of N.C. Gen. Stat. § 14-7.6 prohibits use of same conviction to establish both habitual felon status and prior record level). The trial court's determination of prior record level in the instant case did not violate the plain language of N.C. Gen. Stat. § 15A-1340, and any further argument by defendant should be addressed to the General Assembly.

No Error.

Judge CALABRIA concurs.

Judge GEER dissents by separate opinion.

GEER, Judge, dissenting.

A lynchpin of our judicial system is the principle that the jury will only apply the law as described by the trial judge. A jury is not per-

**STATE v. BAUBERGER**

[176 N.C. App. 465 (2006)]

mitted to engage in a private investigation of the law or to consult outside sources to untangle what the trial judge meant in his instructions. Yet, that is precisely what the jury did in this criminal case. Because I believe defendant was prejudiced by the jury's consideration of extraneous material and, therefore, is entitled to a new trial, I respectfully dissent.

I recognize that in *Lindsey v. Boddie-Noell Enters., Inc.*, 355 N.C. 487, 562 S.E.2d 420 (2002), our Supreme Court, in a per curiam opinion, reversed this Court "for the reasons stated in the dissenting opinion" and that Judge Tyson's dissent held that dictionary definitions do not constitute "extraneous information" for purposes of Rule 606 of the Rules of Evidence. *Lindsey v. Boddie-Noell Enters., Inc.*, 147 N.C. App. 166, 179, 555 S.E.2d 369, 378 (2001) (Tyson, J., dissenting). I firmly disagree with this conclusion, as does the majority, and urge the Supreme Court to revisit it. In any event, I do not believe that this holding—in a civil case—should control in criminal cases.

Significantly, Judge Tyson's dissent stressed the fact that the case before the Court was "a civil action," requiring the trial court to apply a different standard than in criminal cases. *Id.*, 555 S.E.2d at 377-78. The dissent even referenced favorably *State v. McLain*, 10 N.C. App. 146, 148, 177 S.E.2d 742, 743 (1970), and described its holding as follows: "Although it was improper for the jury to obtain and read the [dictionary] definition [of uttering], we held that no reversible error had occurred" when "[t]he trial court instructed the jury to disregard the definition and defendant had not shown any *prejudice* by the jury conduct." *Lindsey*, 147 N.C. App. at 180, 555 S.E.2d at 378-79. *See McLain*, 10 N.C. App. at 148, 177 S.E.2d at 743 ("It was improper for the jury to obtain and read a dictionary definition of one of the offenses charged in the bill of indictment; however, the able trial judge properly instructed the jury to disregard the definition taken from the dictionary and the defendant has not shown that he was prejudiced in any way by the conduct of the jury."). Judge Tyson's dissent contains no indication that he believed *McLain* should be overruled. Nor am I willing to conclude that the Supreme Court intended to do so *sub silentio*.

Both the federal and state constitutions set forth various rights unique to criminal trials, including the right of the defendant to be present in person during the course of his trial. *State v. Buchanan*, 330 N.C. 202, 209, 410 S.E.2d 832, 836 (1991) (observing that the defendant's right to be present throughout his trial arises out of the accused's Sixth Amendment right to confront witnesses and other evi-

dence against him and his due process "right to a 'fair and just' hearing"). Under the federal constitution, a defendant is guaranteed the right to be present at each critical stage of his trial. *Id.* at 217, 410 S.E.2d at 841. The North Carolina constitution, N.C. Const. art. I, § 23, is broader, assuring the accused "the right to be present in person at *every stage* of his trial." *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987) (emphasis added). *See also Buchanan*, 330 N.C. at 217, 410 S.E.2d at 841 ("Under the state constitution, defendant's actual presence is required throughout his trial, not just at particularly important junctures.").[2]

Our Supreme Court has held that the state constitutional right to be present was violated in a number of instances involving interactions with the jury. In *Payne*, the Court held that the right was violated when the trial judge gave admonitions to the jury in the jury room without the defendant being present. 320 N.C. at 140, 357 S.E.2d at 613. In *Monroe*, the Court ordered a new trial when the trial judge conducted unrecorded conferences at the bench with jurors. 330 N.C. at 850, 412 S.E.2d at 654. Likewise, the Court found error when the trial judge passed a note to an alternate juror without revealing its contents to defendant or its counsel, although the Court held the error to be harmless because the transcript reflected the benign nature of the note. *State v. Jones*, 346 N.C. 704, 710, 487 S.E.2d 714, 718 (1997).

As these cases reflect, a defendant is entitled to be present whenever the jury is instructed. When a jury engages in self-help and consults with sources other than the trial judge to clarify the governing the law, it is effectively instructing itself. I do not believe that the *Lindsey* holding, which appears to permit a jury to consult a dictionary, can be reconciled with a criminal defendant's constitutional right to be present when the jury is instructed. At the least, I believe that *Lindsey's* holding that a dictionary does not constitute extraneous material would deny a defendant the fair and just hearing mandated by the Due Process Clause of the federal constitution. *See State v. Williamson*, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991) (holding that the right to a "fair trial by an impartial jury" includes the requirement that "the jury be free from outside influences" such as a dictionary); *State v. Harris*, 340 S.C. 59, 62-63, 530 S.E.2d 626, 627 (2000) ("The

2. The North Carolina Supreme Court has distinguished between capital and noncapital cases by providing that this right may be waived only in non-capital cases. *State v. Monroe*, 330 N.C. 846, 849, 412 S.E.2d 652, 654 (1992). In all cases, however, the State may show that any violation of this right was harmless beyond a reasonable doubt. *Payne*, 320 N.C. at 140, 357 S.E.2d at 613.

Sixth and Fourteenth Amendments of the United States Constitution guarantee a defendant a fair trial by a panel of impartial and indifferent jurors. . . . To safeguard these rights, the jury must render its verdict free from any outside influences," including dictionary definitions.); *State v. Richards*, 195 W. Va. 544, 550, 466 S.E.2d 395, 401 (1995) (holding that in order to ensure a criminal defendant a fair trial, the trial court was required to determine what effect a juror's misconduct in referring to a dictionary had upon the jury's verdict).

I would also note that *Lindsey* appears to stand alone with respect to its "extraneous information" holding. I have located no other decision in any jurisdiction, state or federal, holding that a dictionary does not constitute extraneous material. Although the *Lindsey* dissent adopted by our Supreme Court cites two cases, neither one reaches that conclusion. In *Dulaney v. Burns*, 218 Ala. 493, 497, 119 So. 21, 25 (1928), *overruled on other grounds by Whitten v. Allstate Ins. Co.*, 447 So. 2d 655 (Ala. 1984), the Alabama Supreme Court specifically concluded that a dictionary considered during a jury's deliberations was extraneous matter, but held "the question is whether such extraneous matter, in this instance a Webster's School Dictionary, was prejudicial to appellant." The second case, *State v. Asherman*, 193 Conn. 695, 737, 478 A.2d 227, 252 (1984), *cert. denied*, 470 U.S. 1050, 84 L. Ed. 2d 814, 105 S. Ct. 1749 (1985), only held that use by a jury of a dictionary does not give rise to a presumption of prejudice; a defendant must still demonstrate actual prejudice. The Connecticut Supreme Court continued:

> We hasten to add that the fact that we have found no error in this case does not mean that a trial judge is authorized to furnish a dictionary to a jury upon their request. There may be situations where furnishing a dictionary to a jury may create a presumption of prejudice arising out of injecting unauthorized informational and definitional material into the jury instructions; but that is not this case.

*Id.* at 738, 478 A.2d at 252 (internal citation omitted).

Indeed, with the exception of *Lindsey*, the universal rule appears to be that a dictionary constitutes extraneous material that may not be consulted by a jury. As the Maryland Court of Appeals has explained, the only debate elsewhere revolves around whether prejudice must be shown and, if so, how.

> The problem of the effect on proceedings where one or more jurors have consulted a dictionary during deliberations has been

presented in a number of decisions in other states. It appears to be the near universal consensus that a new trial is not awarded simply because a dictionary was before the jury. The court must conclude that there was prejudice to the complaining party. Analysis by other courts, however, diverges in the approach taken to determine whether use of a dictionary was prejudicial. . . .

Some decisions require that the movant for a new trial essentially prove prejudice in fact. In the absence of such a showing, the new trial is denied. . . .

Other courts have presumed prejudice based solely on use of a dictionary during jury deliberations, with the burden on the adversary to rebut. Under these cases the court may conclude that there is prejudice without proof of the purpose for which the book was consulted.

*Wernsing v. Gen. Motors Corp.*, 298 Md. 406, 414-15, 470 A.2d 802, 806-07 (1984) (internal citations omitted). *See also United States v. Gillespie,* 61 F.3d 457, 459 (6th Cir. 1995) ("A jury's use of a dictionary to define a relevant legal term is error, but it is not prejudicial per se."); *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 924 (10th Cir. 1992) (upholding district court's conclusion that the jury's unauthorized consultation of a dictionary was sufficiently prejudicial to warrant a new trial); *Fulton v. Callahan,* 621 So. 2d 1235, 1248 (Ala. 1993) (holding that definitions of legal terms and concepts from general reference books, such as dictionaries, are extraneous matters); *Wiser v. People,* 732 P.2d 1139, 1141-42 (Colo. 1987) (en banc) (holding that "[t]he court of appeals correctly determined that the resort of one of the jurors to a dictionary for a definition of the crime with which the defendant was charged was improper," but that the court should have applied an objective test to determine whether there was a "reasonable possibility" that the dictionary affected the verdict (internal quotation marks omitted)); *Williamson,* 72 Haw. at 103, 807 P.2d at 596 (holding that "a juror's obtaining of extraneous definitions or statement of law differing from that intended by the court is misconduct which may result in prejudice to the defendant's constitutional right to a fair trial"); *Pietrzak v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 284 Ill. App. 3d 244, 251, 670 N.E.2d 1254, 1259 (1996) ("When the jury consults outside sources for definitions of words contained in jury instructions, the court must determine whether the definitions conflict or substantially differ from the instructions."), *leave to appeal denied,* 171 Ill. 2d 585, 577 N.E.2d 971 (1997); *People v. Messenger,* 221 Mich. App. 171, 176, 561 N.W.2d 463,

**STATE v. BAUBERGER**

[176 N.C. App. 465 (2006)]

466 (1997) (adopting the Sixth Circuit rule "that a jury's use of a dictionary to define a relevant legal term is error, but it is not prejudicial per se"), *leave to appeal denied*, 456 Mich. 955, 577 N.W.2d 688 (1998); *Allers v. Riley*, 273 Mont. 1, 8, 901 P.2d 600, 605 (1995) ("probable prejudice and potential injury was apparent from the fact that the jury used extraneous materials—two dictionaries—to redefine a critical element of this negligence case"); *Priest v. McConnell*, 219 Neb. 328, 337-38, 363 N.W.2d 173, 179 (1985) (holding that a jury's use of dictionary definitions constitutes misconduct, but that a new trial is warranted only when a party demonstrates prejudice); *State v. Melton*, 102 N.M. 120, 123, 692 P.2d 45, 48 (N.M. Ct. App. 1984) (holding that when one juror consulted a dictionary and related the definitions to other jurors, the jury was exposed to extraneous information, giving rise to a presumption of prejudice); *Hillier v. Lamborn*, 740 P.2d 300, 305 (Utah Ct. App.) ("the dictionary was 'extraneous information' " under Utah's Rule 606(b), requiring a determination whether use of the dictionary was prejudicial), *cert. denied*, 765 P.2d 1277 (Utah 1987); *State v. Ott*, 111 Wis. 2d 691, 696, 331 N.W.3d 629, 632 (Wis. Ct. App. 1983) (concluding that "given the nature of the extraneous material [a dictionary definition] brought to the jury's deliberations, the probable effect upon a hypothetical average jury would be prejudicial"). *See generally* Jean E. Maess, Annotation, *Prejudicial Effect of Jury's Procurement or Use of Book During Deliberations in Criminal Cases*, 35 A.L.R.4th 626 (1985 & Supp. 2005) (collecting and analyzing state and federal cases discussing the prejudicial effect of the jury's procurement or use of a book, including a dictionary, during deliberations in a criminal case when the book consulted was not formally introduced into evidence at trial).

In sum, if I were writing on a blank slate, I would hold in accordance with the rest of the country that a jury's unauthorized consultation of a dictionary constitutes consideration of extraneous information under Rule 606. Nevertheless, in criminal cases, I believe that such consultation necessarily constitutes a violation of a defendant's constitutional rights.

As such, the State should have been required to demonstrate that the jury's conduct was harmless beyond a reasonable doubt.[3] *See*

---

3. I recognize that, in *McLain*, this Court did not apply the harmless beyond a reasonable doubt standard. In that case, however, the jury's consultation of the dictionary was discovered prior to the conclusion of the trial and the trial court instructed the jury to disregard the dictionary definition. Since we presume that a jury follows the trial court's instructions, the constitutional concerns existing in this case were not present in *McLain*.

*Marino v. Vasquez*, 812 F.2d 499, 505 (9th Cir. 1987) ("[U]nauthorized reference to dictionary definitions constitutes reversible error which the State must prove harmless beyond a reasonable doubt."). I do not believe that the State has met its burden.

The critical issue in this case was whether the State had proven malice. This Court set out the various methods of proving malice in *State v. Fuller*, 138 N.C. App. 481, 484, 531 S.E.2d 861, 864, *disc. review denied*, 353 N.C. 271, 546 S.E.2d 120 (2000) (internal quotation marks omitted):

> The element of malice may be established by at least three different types of proof: (1) express hatred, ill-will or spite; (2) commission of inherently dangerous acts in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief; or (3) a condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification.

The State, in this case, relied upon the second type of malice, also called "depraved-heart malice." *Id.* (internal quotation marks omitted). The trial court instructed the jury consistent with that definition.

Following those instructions, it is undisputed that the jury foreman read to the rest of the jury a series of dictionary definitions regarding key words contained in the trial judge's definition of the word "malice," including "recklessly" and "wantonly." Using the dictionary, the jury foreman told the other jurors that "recklessly" means "lack of due caution," while "wantonly" means "arrogant recklessness of justice or the feelings of others." Because the definition of "wantonly" refers back to "recklessness," it thus incorporates the concept of a "lack of due caution." In other words, based on the dictionary, the jury could believe that both the "reckless" and "wanton" components of the trial court's definition of "malice" could be met if the jurors concluded that there had been a "lack of due caution."

I believe that the dictionary diluted the degree of recklessness necessary for a finding of "malice." Both this Court and the Supreme Court have recognized that "recklessness" encompasses a range of conduct of various degrees of severity. The Supreme Court stated in *State v. Rich*, 351 N.C. 386, 527 S.E.2d 299 (2000), that "[t]he distinction between 'recklessness' indicative of murder and 'recklessness' associated with manslaughter 'is one of degree rather than kind' " and that instructions must ensure that the jury does not confuse the "high

degree of recklessness" required for second degree murder with "mere culpable negligence." *Id.* at 393-94, 527 S.E.2d at 303 (quoting *United States v. Fleming*, 739 F.2d 945, 948 (4th Cir. 1984), *cert. denied*, 469 U.S. 1193, 83 L. Ed. 2d 973, 105 S. Ct. 970 (1985)). The Court has emphasized that, standing alone, culpable negligence supports only a verdict of involuntary manslaughter. *See id.* at 395, 527 S.E.2d at 304; *State v. Wilkerson*, 295 N.C. 559, 582, 247 S.E.2d 905, 918 (1978). The Court found no error in *Rich* because the trial court "never mentioned culpable negligence" and, in light of the instructions, the Court could not "conclude that the jury could have confused malice with culpable negligence." 351 N.C. at 396, 527 S.E.2d at 304.

I believe that the juror's reference to the dictionary created the potential for just such confusion. The focus on "lack of due caution" risks blurring the distinction between involuntary manslaughter and second degree murder. As this Court has explained, the recklessness referred to in second degree murder instructions "continues to require a high degree of recklessness to prove malice" and the instructions to the jury must ensure that the jurors understand "the high degree of recklessness required for murder as opposed to the lesser degree required for manslaughter." *State v. Blue*, 138 N.C. App. 404, 410, 531 S.E.2d 267, 272, *aff'd in part, rev'd in part on other grounds, per curiam*, 353 N.C. 364, 543 S.E.2d 478 (2000).

Although I recognize that the trial judge's instructions included terms and phrases that ordinarily would be sufficient to ensure that the jury found the requisite high degree of recklessness, the incorporation of the milder concept of "lack of due caution" into both recklessness and wantonness risks allowing a verdict based on the lesser standard of "culpable negligence." "Culpable negligence" is "[n]egligent conduct that, while not intentional, involves a disregard of the consequences likely to result from one's actions." *Black's Law Dictionary* 1062 (8th ed. 2004).

Because I do not believe that the State can demonstrate that the jury's reference to the dictionary definitions of "recklessly" and "wantonly" was harmless beyond a reasonable doubt, I would remand for a new trial. Based on the record in this case, I simply cannot conclude that the jury would have convicted defendant of second degree murder no matter what.

I know of no words that would sufficiently condemn defendant's conduct, and he should be severely punished. He is, however, entitled

to be convicted of second degree murder based on a trial judge's
instructions rather than on a dictionary definition.

